**KEYS YOUTH SERVICES, INC., Plaintiff,**

v.

**CITY OF OLATHE, KANSAS, Larry Campbell, John Bacon, Bill Trout, Michael Copeland, and Gary Mitchell, Defendants.**

No. CIV. A. 98–2398–KHV.

United States District Court, D. Kansas.

June 23, 1999.

James H. Ensz, Sarah G. Madden, Ensz & Jester, P.C., Kansas City, MO, for Plaintiffs.

Anthony F. Rupp, Andrew M. DeMarea, Shughart, Thomson & Kilroy, Overland Park, KS, for Defendants.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Keys Youth Services, Inc. [Keys], a not-for-profit corporation which operates youth homes in Kansas, brings suit against the City of Olathe, Kansas [the City], alleging that the City violated the Fair Housing Act [FHA], 42 U.S.C. §§ 3601 *et seq.,* as amended by the Fair Housing Amendments Act of 1988, Kansas law protecting persons with a disability, K.S.A. § 12–736, and it constitutional rights to procedural and substantive due process and equal protection.[1] This matter comes before the Court on *Plaintiff's Motion for Partial Summary Judgment Against Defendant City of Olathe, Kansas* (Doc. # 36) filed March 9, 1999, and the *Motion For Summary Judgment of Defendant City of Olathe* (Doc. # 38) filed March 12, 1999. For reasons stated below, the Court finds that plaintiff's motion should be sustained in part and overruled in part, and that

---

1. Keys also sued individual council members, but the Court dismissed them on the basis qualified immunity. *See Memorandum and Order* (Doc. # 31) filed February 2, 1999.

defendant's motion should be sustained in part and overruled in part.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

### Factual Background

For purposes of both motions, the following facts are uncontroverted or if controverted, set forth alternately in the light most favorable to each side.

*General Facts:*

Keys is a not-for profit corporation which operates group homes in Johnson County, Kansas. The homes provide residential care for youths between the ages of 12 and 17 who have been abused, neglected or abandoned and who are under the supervision and direction of the Kansas Department of Social and Rehabilitation Services.

On March 3, 1998, Keys contracted to purchase a home at 605 E. Harold in Olathe, Kansas. The home is located on more than one acre of land in an area which is zoned for single family residences. The Olathe City Ordinance Section 18.04.240 defines "family" as follows:

> Family means one (1) or more persons who are related by blood or marriage, living together and occupying a single housekeeping unit with single kitchen facilities; or a group of not more than five (5) adult persons (excluding servants), living together by joint agreement and occupying a single housekeeping unit with single kitchen facilities, on a nonprofit, cost-sharing basis; or a group of eight (8) or fewer unrelated disabled persons including two (2) additional persons acting as house parents or guardians who need not be related to each other or to any of the disabled persons in residence.

Keys proposed to use the home to house ten (unrelated) adolescent males and two or three adult staff members. The City zoning ordinance classified the proposed home as a residential care facility, specifi-

cally, a group board home for minors. *See* Olathe City Ordinance §§ 18.76.020, 18.06.305.[2] Residential care facilities are permitted in residential zoned areas only upon issuance of a special use permit. *See* Olathe City Ordinance 18.54.020. Therefore, on March 13, 1998, Keys applied to the City for a special use permit to operate the group home.

On March 19, 1998, the City issued the required notice of a public hearing before the Planning Commission to hear evidence regarding the requested special use permit, designated SU11–98. In response, more than 85 percent of the property owners within 200 feet of the Keys property filed a protest petition. The filing of that petition triggered a super majority voting requirement under Olathe City Ordinance, 18.12.130, requiring that 75 percent of the city council approve the special use permit. The council has seven members; thus, six members had to approve the permit.

On April 13, 1998, the Planning Commission held a public hearing to consider the special use permit application.[3] Representatives of Keys appeared and presented witnesses who spoke in favor of the permit. Neighbors presented witnesses who spoke in opposition to the permit. The City planning staff recommended that the application be approved, notwithstanding the neighborhood opposition, because the proposed special use would provide a needed service for at-risk youth in the community and was consistent with the City's comprehensive plan. After hearing from both sides, the Planning Commission voted by a 4–2 vote to deny the special use permit.[4]

2. Section 18.06.305 defines a "Group board home for minors" as:

a residential facility for six or more persons under 18 years of age who for various reasons cannot reside in their natural home and where 24 hour adult care, supervision and consultation exists under license of the Kansas Secretary of Health and Environment, except where it is a group home as defined by [K.S.A. § 12–736].

K.S.A. § 12–736 provides in part:

(a) It is hereby declared to be the policy of the state of Kansas that persons with a disability shall not be excluded from the benefits of single family residential surroundings by any municipal zoning ordinance, resolution or regulation.

(b) For the purpose of this act:

(1) 'Group home' means any dwelling occupied by not more than 10 persons, including eight or fewer persons with a disability who need not be related by blood or marriage and not to exceed two staff residents who need not be related by blood or marriage to each other or to the residents of the home, which dwelling is licensed by a regulatory agency of this state;

(2) 'municipality' means any township, city or county located in Kansas;

(3) 'disability' means, with respect to a person:

(A) A physical or mental impairment which substantially limits one or more of such person's major life activities;

(B) a record of having such an impairment; or

(C) being regarded as having such an impairment. Such term does not include current, illegal use of or addiction to a controlled substance, as defined in section 102 of the controlled substance act (21 U.S.C. § 802)

. . . . .

(e) No municipality shall prohibit the location of a group home in any zone or area where single family dwellings are permitted. Any zoning ordinance, resolution or regulation which prohibits the location of a group home in such zone or area or which subjects group homes to regulations not applicable to other single family dwellings in the same zone or area is invalid. Notwithstanding the provisions of this act, group homes shall be subject to all other regulations applicable to other property and buildings located in the zone or area that are imposed by any municipality through zoning ordinance, resolution or regulation, its building regulatory codes, subdivision regulations or other nondiscriminatory regulations.

3. The complaint refers to the Planning Commission and the Zoning Commission interchangeably. Throughout this order the Court refers to the relevant body as the Planning Commission.

4. Plaintiff claims that at the hearing, it presented sufficient evidence for permit approval and that the Planning Commission could not justifiably deny its application. This statement is a legal conclusion, rather than a factual statement, and the Court does not accept it as an undisputed fact.

On May 5, 1998, the City Council considered the issue and voted 6–1 to return the special use application to the Planning Commission. Ten days later, on May 15, 1998, Keys closed on its purchase of the property at 605 E. Harold.

On June 8, 1998, the Planning Commission met to reconsider plaintiff's permit application. The Commission voted 6–3 to deny the permit, and listed factors supporting the denial. Specifically, the Commission set forth two major factors which, it determined, would detrimentally affect nearby property as follows:

a group home for youth at this location constitutes problems of public safety to neighbors and children and the location of the group home in this area will decrease the value of properties in this area.

[ ] Regarding public safety:

(1) Neighbors pointed out that it may not be safe for them or children to walk in the neighborhood. The neighbors referred to police calls to other KEYS group homes in Johnson County.

(2) There were 72 police calls involving KEYS homes in Johnson County in 1997. 5 calls involved assault or battery, six calls involved disorderly conduct, six calls involved thefts, four calls involved criminal damage to property, and two calls related to possession of marijuana.

(3) Neighbors reported very little crime in this neighborhood and the City's police cars are rarely seen in this neighborhood.

(4) The type of police calls indicates that there are youths in the KEYS program who have behavioral problems, who could physically threaten any person (disorderly conduct, battery, assault, and criminal damage), and who could steal or damage property (criminal damage and theft).

(5) There are several daycare centers, two elementary schools in the general area, and young families with children in the general area, presenting a ma-

jor safety concern of juvenile adolescents with behavioral or emotional problems being placed in the KEYS home at this location.

(6) Juvenile offenders are found to be the most difficult, unpredictable and by far the most dangerous people to deal with because of their cavalier behavior.

(7) Even with 24–hours supervision in 1997, there were police calls for KEYS homes; reports show 32 youths ran away from the homes and several youths were found with marijuana. Neighbors pointed out that runaways may steal automobiles or other means of transportation, such as a bicycle, to run away.

(8) There is no guarantee that KEYS will not accept juvenile offenders or juveniles with a felony background into the KEYS home.

Regarding decrease in value of property, a real estate agent familiar with the area indicated that the price of neighboring properties will decrease if a KEYS home is located at 605 E. Harold Street.

*Appendix To The Memorandum In Support Of Defendant City Of Olathe's Motion For Summary Judgment* (Doc. # 40) filed March 12, 1999, Ex. D, p. 405–06.

The Planning Commission also found that "[t]he relative gain to the public health, safety, and welfare by the destruction of· the value of plaintiff's property (neighboring property) as compared to the hardship imposed upon the individual landowner (KEYS) is set out as follows:"

a. Some neighbors indicated that while the KEYS program for youths is needed, they argued that it is not appropriate for this neighborhood due to public safety concerns and effect upon property values.

b. Police calls at KEYS homes in Johnson County in 1997 indicated that public safety is a serious concern. Public safety will be affected by the location of a KEYS home for youths with emotional

and behavioral problems. The neighbors expressed concerns about safety to the senior citizens and children living and walking in the neighborhood. They also expressed concerns about increased crime in the neighborhood where there had been no criminal activity.

c. On the studies on group homes regarding the effect of group homes on public safety and property valuation in the general area, there was no reference if any study focused on group homes for youths.

d. The neighbors have said that a real estate broker indicated that due to the KEYS proposal, property values will decrease.

*Id.* at 406.

The Commission also found that

Under 42 U.S.C. Sec. 3604(f)(9) of the FHA regarding public safety concerns, nothing in the FHA requires that the KEYS home be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others. Furthermore, the 10th Circuit Court [in] *Bangerter* stated that housing can be denied altogether for those same reasons.

Pursuant to two court cases, *Act 1 Inc.*, and *Sunderland Family Treatment Services*, the youths who present problems of physical abuse, neglect, sexual abuse, or "child in need of care" but not abuse or neglect, and being placed in the KEYS group home are not considered "handicap" [sic] under the FHA.

*Id.* at 407.

On July 7, 1998, the City Council again considered plaintiff's application. At a short public hearing, James Ensz, president of the Keys board, presented evidence supporting its application.[5] At the time of the hearing Keys took the position that it had no duty to present evidence because as a matter of law it was entitled to use its property as a group home. The Council rejected the application by a 4–3 vote.

When Keys applied for its special use permit in this case, it was already operating another group home in Olathe on 151st Street.

Although Keys has not obtained a state license from the State of Kansas to operate a group home at 605 E. Harold, the State of Kansas will grant the license if the Court determines that Keys is entitled to occupy the facility as a group boarding care home. *See Journal Entry* (Doc # 35) filed March 9, 1999.

*Facts Regarding Whether Keys Residents Meet The FHA Definition Of "Handicapped"*[6]

The mission of Keys is to provide professional treatment and continued support under family-like conditions for youths who have emotional problems which result from abuse, abandonment or neglect. The Kansas Department of Social and Rehabilitation Services (SRS) places most of the Keys youth. SRS refers juvenile offenders, children-in-need-of-care, and youth who have problems which stem from physical abuse, neglect, truancy, and sexual abuse. Most Keys residents have developed emotional problems as a primary result of environmental and cultural factors.

SRS categorizes youth behavioral problems from Level III to Level VI. Level VI is the most severe category; and youth who are in this category must be in lockdown facilities. Keys proposes to operate a Level V home on its property. Level V homes include children who exhibit antisocial and aggressive behavior including fighting, theft, vandalism, assault and battery. Level V youth require a controlled

---

5. The City did not preclude Keys from presenting any evidence it wanted to present.

6. The Fair Housing Act Amendments use the term "handicapped," while the Americans with Disabilities Act uses the term "disabilities." Because case law interpreting the ADA is also helpful in applying the FHA, the Court uses the terms interchangeably in this memorandum.

environment with a high degree of supervision and intensive services, and have usually failed in other less structured environments. Many of the residents will also have behavioral problems. Parents and teachers describe such youth as uncooperative, argumentative, dishonest, cruel, aggressive, moody, disruptive and sometimes assaultive. Level V youth may have previously resided in a Level VI facility.

To participate in the Keys program, residents must not be in an active episode of chemical dependency, must not have past behavioral patterns such as murder, sexual assault, robbery, or repeated violent acts against self or others, and must not have been diagnosed with *severe* emotional disturbances or a psychotic condition that would require long term treatment. Admission standards for Keys do not require that a resident possess a physical or mental impairment, however, or any other disability or handicap. Residents must have a minimum full scale IQ of 70 and must be able to function with abstract concepts and token economies. Further, at any given time, Keys may or may not have residents who are physically impaired.[7]

Keys asserts that 95 per cent of its youth, or more, have recognized mental problems. While in the Keys program, they receive ongoing psychological or psychiatric treatment.[8] Doc. # 40, Ex. F, Brown Depo., p. 110–11. Keys is not, however, a program for the "mentally handicapped." *Id.* at 48.

Dr. Edward Neufeld, a licensed psychologist who treats Keys residents in Johnson County, Kansas, spoke at the first Planning Commission hearing on April 13, 1998. Dr. Neufeld provided specific information about typical residents of Keys homes. He stated that one resident had a specific learning disability which caused frustration and behavioral problems, and noted that such problems are "very common with kids with attention deficit disorder or specific learning disabilities." *Plaintiff's Memorandum In Support Of Its Motion For Partial Summary Judgment Against Defendant City Of Olathe* (Doc. # 37) filed March 9, 1999, App. II, p. 86. Dr. Neufeld also made the point that while "by and large," Keys residents would not be academically and intellectually handicapped, a learning disability can become a behavioral problem for a normally functioning kid. *Id.* at 86–87.

*Facts Relating To Public Safety*

At the Planning Commission hearings, neighbors presented testimony relating to public safety concerns. On June 15, 1997, residents of the Keys home on 151st Street sneaked out and went on a "crime spree," setting a car on fire, burglarizing more than 20 cars, breaking into several businesses, stealing, shoplifting, defecating on a car, and vandalizing real and personal property. At the time, the home had no staff on waking duty at night. After the incident, Keys hired additional night staff at its Level V homes, and no night-time incidents have recurred. In addition to the one incident, however, the Keys staff at 151st Street has reported five runaways, four batteries, three assaults, and two cases of criminal damage to property. Keys requires its staff to report to police even minor incidents which involve residents. Pursuant to this policy, Keys staff reported all of the foregoing incidents even though both the perpetrators and the victims, if any, were Keys residents.

In his deposition, Dr. Neufeld agreed that Keys residents exhibit behavioral problems in school, truancy, aggression, runaway behavior, and substance abuse

---

7. Keys has not made special physical accommodations for people with physical impairments.

8. Linda Brown, the executive director of Keys, gave the 95 per cent figure in response to a question how many Keys residents have "recognized mental problems of any kind." Doc. # 40, Ex. F, Brown Depo., p. 110. She gave the same figure in response to a question whether 100 percent of Keys residents are involved with a psychologist or psychiatrist when they come into the home. *Id.* She did not provide specific information as to what type of mental problems the residents have.

problems. He testified that the safety risk to neighbors is rather low, however, because the program is so structured. Residents do not drive, so the risk of automobile accidents is virtually nil. He testified as follows:

> I'm relatively convinced if this child were not in a group home or if this child were in a home of origin they would be in a greater risk for acting out than they are in a group home, because of supervisory structure. So I can argue that you get a combined lower risk if you have a group home than if you don't have a group home in terms of the entire community.

Doc. # 40, Ex. I, Neufeld Depo., p. 47. On the other hand, Keys can not be certain that its residents will refrain from aggressive actions in the program.

At the Planning Commission hearing on April 13, a neighbor, Loy Hayden, noted that by its own admission, Keys could not guarantee that no one with an extensive criminal background would be placed in the home at 605 E. Harold. Hayden also expressed concern that since juvenile crime records are not public, no one except Keys would know who was being placed in the home or what their criminal records were. Ensz countered that Keys will not accept a youth if it has any reason to believe that he will be dangerous to himself or others. Doc. # 40, Ex. B, Minutes of April 13, 1998, Meeting, p. 95.

Also at the Commission hearing on April 13, neighbors pointed out that several schools and day care centers are located in the area and expressed concern about the safety of neighborhood children. *Id.*, p. 89, 91. A federal probation officer who lives in the neighborhood stated at that hearing that juvenile offenders are the most difficult, unpredictable, and by far the most dangerous of offenders. Other neighbors expressed concern that the home would inject criminals into the neighborhood. *Id.* at 89–90. One neighbor stated that he had worked with Keys children in the school district, that they are not constantly supervised and that they sometimes run away. He added that the homes sometimes have problems with alcohol and drug use. *Id.* at 90–91. Another neighbor said he had reviewed public records which showed that a Keys home had nine runaways in 1997.[9] Shelly Shaw, a teacher at Olathe North High and Oregon Trail Middle school, stated that she had extensive experience with Keys students, that she would be scared to live next to a Keys home, and that she was afraid for nearby elementary and day care children. She reported that based on her teaching experience, it was obvious that some Keys youth were involved in gang activity. *Id.* at 92. Frank Brockway, an immediate neighbor of the proposed home, stated that in his work as an employee of SRS, he had dealt with one Keys resident who had done considerable property damage around the home and another one who had escaped, stolen a car, and broken into Olathe businesses. *Id.* at 93.

Police records for Shawnee, Kansas indicate that the Keys home in that city has generated calls which involve runaways, disorderly conduct, battery, theft, burglary, escape, and other offenses. *See* Doc. # 40, Ex. F, Brown Depo. p. 78. All of the police calls originated, however, in the home itself.

At the Planning Commission hearing on April 13, Keys program director Elizabeth Barker explained that when a Keys home is full and fully staffed, the staffing ratio is at least two staff members to ten residents. Sometimes the staffing ratio is one to seven. While no college degree is required, staff must be 21 years old. The manager and assistant manager of each

---

9. Mission, Kansas police records in a one-year period reflect 23 police calls from Keys for, among other things, disorderly conduct, runaways, assault, battery, criminal possession of explosives, possession of marijuana and stolen property. Except for a bicycle which was taken from a school and immediately turned over to police, none of the reports involved personal injury or property damage to neighbors. Doc. # 40, Ex. F, Brown Depo., p. 77–78.

home are expected to have college degrees in the social services area. Doc. # 40, Ex. B, p. 81.

On the east side, the Keys property at 605 E. Harold abuts three single-family homes. On the south, it adjoins four single family homes. On the west, it adjoins two single family homes. The north side of the property faces Harold Street and two homes which are located across the street. Doc. # 40, Ex. F, Brown Depo. p. 82.

### Fact Related To Property Values

At the Planning Commission hearing on April 13, neighbors (including a realtor), stated that the Keys home would reduce the value of nearby property. Robert Smith, a realtor, stated that sellers in the area would have to disclose to potential buyers the existence of the group home. Planning Commission staff presented information from the *Zoning and Planning Law Handbook* by Daniel Lauber. That Handbook reviewed 50 studies which considered the impact of group homes on property values and concluded that group homes do not reduce the values of surrounding property.[10]

### Facts Related to the Familial Status of Keys Residents

At his deposition, Dr. Neufeld testified that he would not refer to Keys as a "family environment," because its homes "are not group homes characterized by a foster parent or two foster parents who live there all the time." Rather, he said, "It is more a staffing situation." Doc. # 40, Ex. 1, Neufeld Depo., p. 12. The staff works on day and night shifts and does not reside at the home.

The Secretary of the Kansas SRS is the legal guardian of the Keys youth residents, and the Secretary designates Keys to provide residential and other services to the youth while they reside in a Keys home. Linda Brown, the executive director of Keys, testified in her deposition that while at Keys, youth are subject to the same direction, control and environment as in an ideal normal family residential setting. Doc. # 40, Ex. F, Brown Depo., p. 65.

### Facts Relevant To Damages

Keys purchased the residence before it received a state license to operate the property as a group home. Keys closed on the sale after the Planning Commission hearing on April 13, 1998, and it was thus aware of strong neighborhood opposition. Keys also knew that to get a special use permit, it needed a 6–1 vote in the City Council. Keys claims that it went forward with the purchase because it expected the City Council to recognize that the City had no right to deny Keys the right to use its property as a group home.

SRS reimburses Keys for the children it houses. The daily reimbursement rate is between $70.00 and $72.35. Keys spends the reimbursement on housing, supervision, transportation, basic living expenses, food, clothes, recreation and school supplies. The parties disagree whether Keys must spend the exact amount of reimbursement on each child. The City claims that it must. Keys asserts that if it operates the homes efficiently and at high capacity, it can generate annual income of $60,492.85, and that it can spend its income within the entire Keys system to improve the overall quality of life of all residents, increase wages, and increase its cash reserve.

Because the house at 605 E. Harold is not now functioning as a group home, Keys has not expended any funds on the youth who might ultimately be housed there and SRS has not reimbursed Keys for any such expenses. Since it purchased the home, Keys has paid the mortgage, maintenance costs, utilities and real estate taxes.

### Additional Uncontested Facts Proposed By Keys:

Keys asserts that the only reason it had to apply for a special use permit was because it did not meet the definition of "family," as defined in the city ordinance.

---

**10.** Keys presented evidence that generally a group home is very well maintained.

At the public hearings Keys stated that the residents would be predominantly and preferentially from Johnson County, that Keys would closely monitor them around the clock, and that they would not have access to vehicles, drugs or weapons.

At her deposition, Ms. Brown testified that to her knowledge, in 30 years of Keys' existence, Keys residents had no history of bothering neighbors. Eighty percent of the youths successfully graduate from the Keys home and are reintegrated with society without further intervention. Also, according to her affidavit, Keys cannot economically run a home with eight or fewer residents. Olathe currently authorizes the Keys home on 151st Street to have ten resident youth. Before it denied the special use permit on the property at 605 E. Harold, the City's law firm advised that the City should issue the permit.

*The Complaint*

In Count II, Keys asserts that the FHA required the City to issue the special use permit as a reasonable accommodation for potential residents who are handicapped by mental impairments. Keys also asserts that in denying the permit, the City discriminated against potential residents (and thus Keys) because of the "familial status" of the residents. *Complaint* ¶ 25. Keys asserts that if the ten young men and two or three supervising adults had been related by blood, they would have been absolutely entitled to occupy the house without a special use permit under the city ordi-

nance. *See* Olathe City Ordinance § 18.54.020. Moreover, Keys asserts that under state law, K.S.A. § 12–736, ten persons may occupy a group home in a single family residential setting, notwithstanding local zoning to the contrary.[11]

Keys claims that the City has caused it to suffer irreparable harm for which it has no adequate remedy in law. Keys asks the Court to declare that it is entitled to occupy and use its home as a group home for ten youth with appropriate adult supervision, and that Keys is in compliance with local zoning laws.[12] It also seeks actual and punitive damages. In Count III Keys asserts that the City violated the Fourteenth Amendment by denying its rights to equal protection, substantive due process, and freedom from taking without due process of law, as well as its rights under the FHA, and that such violations are actionable under 42 U.S.C. § 1983. Keys claims that it is entitled to actual damages and attorneys' fees, as well as the declaratory relief sought in Count II. In Count IV, Keys asserts that the City has violated K.S.A. § 12–736 and asks the Court to declare that it is entitled to occupy and use its property as a group home. In the alternative, Count V asserts that as a matter of law the City lacked sufficient substantial evidence to deny the application for a special use permit. Keys asks the Court to declare that it is entitled to the special use permit and order the City to issue it.

---

11. K.S.A. § 12–736 provides that "persons with a disability shall not be excluded from the benefits of single family residential surroundings by any municipal zoning ordinance." It also provides that "[n]o municipality shall prohibit the location of a group home in any zone or area where single family dwellings are permitted" and declares unlawful any zoning ordinance, resolution or regulation which prohibits the location of a group home in such zone or area or which subjects group homes to regulations not applicable to other single family dwellings in the same zone or area. By its definition of what constitutes a "group home," however, Kansas law extends this protection only to dwellings occupied by ten persons, or by eight or fewer persons with a disability.

12. In this and other counts, Keys asks the Court to direct the State of Kansas to issue a license for a group home. By reason of the stipulation to which the Court made earlier reference, this request is moot. Defendant Gary Mitchell, Secretary of the Kansas Department of Health and Environment, has agreed to issue such a license if the Court determines that Keys is entitled to occupy the facility as a group boarding care home. The parties have agreed that the complaint against Mitchell should be dismissed without prejudice, and the Court so ordered in a *Journal Entry* (Doc. # 35) filed March 9, 1999.

In its motion for partial summary judgment, plaintiff argues that it is entitled to judgment as a matter of law on its Fair Housing Act claims, except as to the amount of damages. In its cross-motion for summary judgment, the City claims that it is entitled to judgment as a matter of law on each of plaintiff's claims.

### Analysis

The federal rights involved in this case are plaintiff's rights under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, as amended by the Fair Housing Amendments Act of 1988, and its constitutional rights to equal protection and substantive due process and freedom from taking of property without due process of law.

### I. *Fair Housing Act*

The Court first addresses plaintiff's FHA claims. The FHA provides in relevant part that it is unlawful

(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter;

(B) a person residing or intending to reside in that dwelling after it is sold or rented, or made available; or

(C) any person associated with that buyer or renter.

(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling ... because of a handicap of [any person listed in (A) through (C) above].

42 U.S.C. § 3604(f)(1) and (2).

The FHA defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

The FHA defines "handicap" as follows:

(h) "Handicap" means, with respect to a person—

(1) a physical or mental impairment which substantially limits one or more of such person's major life activities,

(2) a record of having such an impairment, or

(3) being regarded as having such an impairment ...

42 U.S.C. § 3602.

The regulations which implement the 1988 amendments to the Fair Housing Act provide that physical or mental impairments include:

Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. The term physical or mental impairment includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, autism, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, Human Immunodeficiency Virus infection, mental retardation, emotional illness, drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism.

24 C.F.R. § 100.201(a)(2) (1994). The FHA definition of "handicap" is identical to the definition of "disability" in the Americans with Disabilities Act (ADA). Many FHA cases have therefore relied on ADA cases to interpret the meaning of the word "handicap" under the FHA.[13] *See, e.g., Roe v. Housing Auth.,* 909 F.Supp. 814, 820–21 (D.Colo.1995).

The FHA also prohibits discriminatory housing practice based on "familial status."

---

**13.** For that reason many courts (including this one) have used the terms interchangeably.

The FHA defines "familial status" as follows:

> (k) "Familial status" means one or more individuals (who have not attained the age of 18 years) being domiciled with—
>
>> (1) a parent or another person having legal custody of such individual or individuals; or
>>
>> (2) the designee of such parent or other person having such custody, with the written permission of such parent or other person.
>
> The protection afforded discrimination on the basis of "familial status" shall apply to any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of 18 years.

42 U.S.C. § 3602(k).

The FHA also includes a provision that entirely exempts from the reach of the FHA "any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." 42 U.S.C. § 3607(b)(1). In *City of Edmonds v. Oxford House, Inc.,* 514 U.S. 725, 730, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995), the Supreme Court held that this provision only exempts total occupancy limits which are intended to prevent over-crowding, and not ordinances which are designed to promote the "family character" of a neighborhood. *See id.* at 733, 115 S.Ct. 1776 (maximum occupancy restrictions "cap the number of occupants per dwelling, typically in relation to available floor space or the number and type of rooms").

Keys argues that it is entitled to partial summary judgment on its FHA claims because it has established as a matter of law that in denying the special use permit the City unlawfully discriminated against potential residents on the basis of family status and handicap, and failed to reasonably accommodate handicapped potential residents. In its cross-motion for summary judgment, the City claims that it is entitled to judgment as a matter of law on plaintiff's FHA claims because Keys residents are not handicapped, the familial status provisions of the FHA do not apply, and in any event the City properly denied the special use permit based on specific, substantial evidence of a threat to public safety.

Although the complaint does not allege that the City violated specified provisions of the FHA, it clearly alleges that the City violated the Act by making the Keys home unavailable to potential residents on the basis of handicap [§ 3604(f)(1) ] and familial status [§ 3602(k) ]. Thus the initial question is whether proposed residents are protected under the handicap and/or familial status provisions of the FHA.

### A. *Handicap Status*

The City contends that it is entitled to summary judgment on the FHA handicapped discrimination claim because on this record, as a matter of law, potential residents of the home are not handicapped. Keys contends that it is entitled to summary judgment on this claim because as a matter of law, potential residents *are* handicapped.

The City asserts that those few courts which have addressed the issue have found that children in homes for abused and neglected children are not handicapped under the FHA. *See Sunderland Family Treatment Servs. v. City of Pasco,* 127 Wash.2d 782, 903 P.2d 986 (1995) ("abused and neglected children" not shown to be handicapped based on record before court); *Act I, Inc., v. Zoning Hearing Bd. of Bushkill Township,* 704 A.2d 732 (Pa. 1997) (victims of abuse, removed from their homes, not "handicapped"). In those cases, however, plaintiffs alleged merely that the children had been abused and removed from their homes.

In *Act I,* the group home director testified at the administrative hearing that potential residents were victims of abuse who had been removed from their homes, and that "they [were] neither physically or mentally handicapped nor socially or emotionally disturbed." The home would not

provide prescribed medication or counseling at the facility. Consequently the court found that the children were not "handicapped" under the FHA. 704 A.2d at 734–35.

In *Sunderland,* plaintiff argued for the first time on appeal that it proposed to serve children who had severe emotional disturbances. Given the procedural posture of the case, the Supreme Court of Washington refused to consider whether the children met the statutory definition of handicapped. It specifically stated that:

> In deciding whether the children are handicapped, we look only to the factual record created by [plaintiff] at the administrative hearing for a description of the children's impairment....
>
> . . . . .
>
> The factual record before the City at the time of its decision reveals the children to be served are abused, homeless, neglected, or have nowhere else to go. Only in the letter requesting review from the city council does [plaintiff] assert "these youths for the most part have emotional disabilities," but it provides no elaboration. Therefore, we do not consider whether emotionally disturbed children are handicapped, but whether abused and neglected children are handicapped.

*Sunderland,* 903 P.2d at 990 (internal citations omitted). In determining whether the abused and neglected children were handicapped, the court relied on a regulation which interpreted the Rehabilitation Act in finding that abuse and neglect are environmental and cultural factors and—although they may produce physical or mental effects—such effects do not in every case limit the victim's participation in major life activities.[14] The *Sunderland* court further found that the record indicated that others did not regard the children

as having such an impairment. The court rejected plaintiffs' argument that the mere fact of neighborhood opposition proved that the children were "regarded as having such an impairment." 903 P.2d at 992. It found that the neighborhood opposition was based not on perceived physical or mental impairments, but on "worry about the behavior of teenagers, particularly those with troubled family backgrounds." *Id.* The court thus concluded that the children were not handicapped based on a perceived physical or mental impairment.

In this case, Keys does not argue that the residents are "regarded as having such impairment." Rather, it relies on the first statutory definition of "handicap"—"a physical or mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. § 3602(h)(1). In applying the identical language in an ADA case, the Tenth Circuit cited *Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998):

> The Supreme Court recently announced, "consideration of subsection (A) of the definition proceeds in three steps." *Id.* First, the court must determine whether the plaintiff has an impairment. Second, the court must identify the life activity upon which the plaintiff relies and determine whether it constitutes a major life activity under the ADA. Third, "tying the two statutory phrases together, [the court] ask[s] whether the impairment substantially limited the major life activity." *Id.* Thus, the Court in *Bragdon* makes clear that whether a claimed affliction constitutes an impairment under the ADA and whether the identified endeavor constitutes a major life activity are determinations of law for the court to decide. It follows that a plaintiff must specifically plead or prove at trial

---

14. The *Act I* court had relied in part upon a Rehabilitation Act regulation which stated that

> only physical and mental handicaps are included. Thus, environmental, cultural, and economic disadvantage are not in them-

selves covered.... Of course, if a person who has any of these characteristics also has a physical or mental handicap, the person is included within the definition of handicapped person.

45 C.F.R. p. 84, app. A, at 355 (1994).

the impairments and the major life activities he or she asserts are at issue. *Poindexter v. Atchison, Topeka & Santa Fe Ry. Co.*, 168 F.3d 1228, 1230 (10th Cir.1999) (quoting *Bragdon* ).

The City insists that the largely undisputed facts of record compel a finding that potential residents are not handicapped.[15] It points out that Keys does not require that residents be physically or mentally impaired, or that they be disabled or handicapped. In fact, it notes that Keys does not accept youth with "severe emotional problems." The City acknowledges Dr. Neufeld's view that typically, some Keys residents have learning disabilities that cause frustration and behavior problems. But the City also notes that in response to a question from the audience, Dr. Neufeld stated that "by and large," residents will not be academically and intellectually handicapped. Keys contends that it is entitled to summary judgment on this claim because as a matter of law, potential residents *are* handicapped.

Both parties are right, to some extent.[16] Keys does not operate homes for the handicapped and the City correctly notes that not all potential residents will meet the definition of "handicapped." Keys has provided evidence, however, which establishes as a matter of law that *some* potential residents meet the FHA definition of handicapped, in that they have mental impairments which substantially limit the major life activity of learning. FHA regulations provide that a physical or mental

impairment includes "emotional ... illness, and specific learning disabilities." Dr. Neufeld and Ms. Brown testified that many prospective residents have emotional problems and/or specific learning disabilities. As to emotional problems, a Level V facility like the Keys home houses youth who frequently exhibit serious behavioral problems which are typically anti-social and aggressive. Their conduct may reflect an emotional disturbance, requiring a controlled environment with a high degree of supervision and intensive services. Keys provides professional treatment and continued support under family-like conditions for youth who have emotional problems resulting from abuse, abandonment or neglect. As to learning disabilities, Dr. Neufeld stated that many youth who have specific learning disabilities and attention deficit disorders experience significant frustration at school, and their behavior problems stem to a large degree from these disabilities. These potential residents thus qualify as individuals with a handicap under the FHA.

■ On this record the Court finds that plaintiff gave the City notice that potential residents will be "disabled" under the FHA, in that some of them will exhibit specific learning disabilities, antisocial disorders and emotional disturbances which require intensive services including counseling and a high degree of supervision.[17] These impairments in at least some indi-

15. To the extent the City relies upon deposition testimony and affidavits which were not presented in the hearing process, its evidence is not properly considered in determining whether the City intentionally discriminated against potential residents on the basis of their handicap. Such evidence would be relevant, however, to whether the City's action had a discriminatory impact and whether Keys is entitled to prospective relief.

16. Many of the statutory issues in this case are made exceedingly difficult by the fact that because it cannot currently operate the facility, Keys cannot know who the specific residents will be or whether they are handicapped. Even if the facility were in opera-

tion, its population would vary from time to time. The Court assumes that at any given point in time, the residence would include both handicapped and non-handicapped youth and that the mix would vary over time. Much of the law on this subject assumes that group homes serve entirely distinct and non-overlapping universes of handicapped and non-handicapped individuals, and does not address the issues which arise in mixed or fluid populations.

17. The City does not dispute this evidence in any material respect. Both parties focus their attention on the degree to which individuals with such handicaps will be represented in the population of residents at the home.

viduals will substantially limit one or more major life activities, particularly learning.

 Assuming that *some* potential residents are "handicapped" under the FHA, the issue is whether the City discriminated on the basis of handicap and, more specifically, whether either party is entitled to summary judgment on that issue. Plaintiff can set forth a prima facie case of FHA handicap discrimination in three ways: by showing "intentional discrimination, discriminatory impact, or refusal to make reasonable accommodations." *Roe v. Housing Auth.*, 909 F.Supp. 814, 820 (D.Colo. 1995). Keys' complaint does not clearly state the precise theory of the FHA claims and no final pretrial order has yet been entered. In their summary judgment briefs, however, the parties address (to varying degrees) all three types of FHA claims.

1. *Discriminatory (Disparate) Treatment*

 A disparate treatment claim involves differential treatment of similarly situated persons or groups. "The ultimate question in a disparate treatment case is whether the defendant intentionally discriminated against plaintiff." *Bangerter,* 46 F.3d at 1502. Keys appears to assert both that the special use ordinance intentionally discriminates against the handicapped and that the City intentionally discriminated against the handicapped in the permit application process.

Keys first claims that the special use ordinance intentionally discriminates against the handicapped. This issue is convoluted, as plaintiff defines it, because the ordinance actually *favors* persons who are "disabled": it allows only five non-disabled adults to reside together if they are unrelated, but permits group homes for up to *eight* unrelated *disabled* persons. *Cf. Bangerter,* 46 F.3d 1491, 1501 (10th Cir.1995) (disparate treatment appropriate analysis for ordinance which allows group homes but requires that group homes for mentally or physically disabled obtain special use permit and also allows localities to impose special conditions on those homes).

Keys, however, appears to allege that the ordinance *discriminates* against the handicapped by allowing any number of related non-disabled persons to reside together while limiting group homes to eight unrelated disabled residents. According to Keys, the ordinance on its face treats related persons preferentially to all others, and "in this sense" it intentionally discriminates against handicapped individuals who wish to live in group homes of more than eight unrelated residents. *See Children's Alliance v. City of Bellevue,* 950 F.Supp. 1491, 1496 (W.D.Wash.1997) (city ordinance that imposed burdens on staffed group homes for youths, some of whom were handicapped, violated FHA; court analyzed under disparate treatment framework).

The Court makes short work of the complaint that the ordinance treats related persons preferentially to all others, in the sense that it discriminates against handicapped individuals who wish to live in group homes of more than eight unrelated residents. By ordinance, any number of related persons can live together in a single housekeeping unit (whether they are disabled or not) but group homes can only have eight unrelated disabled residents. Plaintiff's argument has an inherent structural defect, in that to prove discrimination it seeks to compare related disabled persons with unrelated disabled residents, but it ignores the fact that "in this sense" the ordinance equally discriminates between unrelated disabled residents and unrelated *non*-disabled residents. In this scenario it is obvious that the real discrimination is between *related* persons and *unrelated* persons, and not between disabled and non-disabled persons. Under Keys' argument, "handicapped individuals who wish to live in group homes of more than eight unrelated residents" are disadvantaged because they want to live with unrelated residents, not because they are handicapped.

Second, Keys claims that the City (through its officials in the permit process) intentionally discriminated against potential disabled residents. To prove this claim Keys need not show that the intentional discrimination was motivated by animosity against people with disabilities. *See Bangerter,* 46 F.3d at 1500. Keys must show, however, that a decision to deny housing opportunities was motivated to some degree by unjustified consideration of the disabled status of individuals affected by the decision. *See Bryant Woods Inn, Inc. v. Howard County, Maryland,* 911 F.Supp. 918, 929 (D. Md. 1996). Keys must show that government officials, regardless of their personal views, "are effectuating the discriminatory designs of private individuals." *Dailey v. City of Lawton,* 425 F.2d 1037, 1039 (10th Cir. 1970) (1983 racial discrimination).

In its motion for partial summary judgment, plaintiff argues that it is entitled to judgment as a matter of law on its FHA disparate treatment claims because the City did not follow the recommendations of its staff and the advice of its attorneys, but relied on the objections of the neighbors. In its cross-motion for summary judgment, the City claims that it is entitled to judgment as a matter of law because even if Keys has shown that it is entitled to protection under the FHA, the City has articulated a threat to public safety as a legitimate, nondiscriminatory reason for its action.

In deciding the City's motion for summary judgment, this Court must draw all reasonable inferences in favor of Keys because officials "seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate." *Smith v. Town of Clarkton,* 682 F.2d 1055, 1064 (4th Cir. 1982). Keys must nonetheless come forward with some evidence of discrimination. Thus the Court must determine whether, on the largely undisputed summary judgment facts, a fact-finder could reasonably find that the City's decision to deny the special use permit was motivated by the disabled status of potential residents.[18]

In this regard, Keys argues that strong neighborhood opposition swayed the City Council decision. Statements at the public hearings and in letters to the City Council and Planning Commission clearly suggest substantial political pressure to deny the permit. Neighbors expressed concerns centered on the potential for increased crime and reduced property values, and they presented evidence of crime by residents at other Keys homes, including assault, battery and theft.

Section 3604(f)(9) permits reasonable restrictions on the terms or conditions of housing (as well as outright denial of housing) if justified by public safety concerns.[19] 46 F.3d at 1503. But the Tenth Circuit has emphasized that such exceptions must be narrowly construed:

> Restrictions predicated on public safety cannot be based on blanket stereotypes about the handicapped, but must be tailored to particularized concerns about individual residents. As the FHAA's legislative history declares, the FHAA

---

**18.** To the extent that Keys argues the City discriminated against potential residents on the basis of their handicap by requiring it to go through the permit process, the Court finds no controlling authority so holding. As the City points out, the Tenth Circuit in *Bangerter* analyzed defendant's actions under a special use permit process. The Tenth Circuit did not suggest such a process is in itself discriminatory. *Cf. Oxford House–C v. City of St. Louis,* 77 F.3d 249, 253 (8th Cir.1996) (plaintiff must give city opportunity to accommodate group home through procedure for adjusting zoning).

**19.** Defendant points out that "the FHA expressly allows discrimination rooted in public safety concerns, when it provides that '[n]othing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others.'" *Bangerter,* 46 F.3d at 1503 (quoting 42 U.S.C. § 3604(f)(9)).

"repudiates the use of stereotypes and ignorance, and mandates that persons with handicaps be considered as individuals. Generalized perceptions about disabilities and unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion." H.R.Rep. No. 100–711 at 18, 1988 U.S.Code Cong. & Admin. News at p. 2179. Any special requirements placed on housing for the handicapped based on concerns for the protection of the disabled themselves or the community must be "individualiz[ed] ... to the needs or abilities of particular kinds of developmental disabilities," *Marbrunak, Inc. v. City of Stow* [ ], 974 F.2d 43, 47 (6th Cir.1992), and must have a "necessary correlation to the actual abilities of the persons upon whom it is imposed," *Potomac Group Home*, 823 F.Supp. at 1300.

*Bangerter*, 46 F.3d at 1503. A decision based on unfounded fears of citizens would be discriminatory. *Cf. Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810 (4th Cir. 1995) (zoning authority did not discriminate merely by influence of community pressure if such pressure was based on legitimate land use issues). Therefore, under the FHA, the Court must analyze challenged actions under more than a rational relationship test.

Analysis of the public safety issue in this case is complicated by the fact that only some of the residents will be handicapped and the Court cannot know how many will be handicapped or what their specific disabilities will be. Keys admits that residents will have "serious behavioral problems which are typically anti-social and aggressive." Both handicapped and non-handicapped youth have been known to exhibit anti-social, aggressive behavior, but the handicapped residents are entitled to protection from discrimination while the others are not. The FHA prohibits discrimination on the basis of handicap, not on the basis of behavior. Therefore the fundamental question is whether the City denied the permit because potential residents are handicapped or, to borrow the vernacular, because they are hoodlums or potential hoodlums. The pressing corollary to this question is whether either side wins the point as a matter of law. Ten adolescents who exhibit anti-social, aggressive behavior can certainly present legitimate public safety issues. The more difficult question is whether the City viewed such issues as ones related to the disabilities of some residents—whether it based its decision on unfounded assumptions about the impact of people with disabilities, an action that the FHA forbids.

The Court finds that Keys has presented facts which could permit but not require a jury to find that City intentionally discriminated against potential residents in part because of their handicap. On the other hand, the City has presented facts that could support a jury finding that the handicapped status of some potential residents was not a motivating factor in its decision. Therefore the Court finds that both Keys' motion for partial summary judgment and the City's motion for summary judgment on this claim should be overruled.[20] The jury is entitled to consider whether the City's stated public safety concerns were pretextual and, if it finds that its explanation is unworthy of credence, infer the ultimate fact of intentional discrimination.[21]

**20.** The evidence in this case does not preclude the possibility that the City had mixed motives, both lawful and unlawful, for its action.

**21.** This record does not foreclose the possibility that the City had a good faith but mistaken belief that Keys residents constitute a direct threat to the health or safety of other individuals or would result in substantial physical damage to the property of others. *See* 42 U.S.C. § 3604(f)(9). This possibility calls to mind the difficulty in distinguishing good faith but mistaken beliefs about the handicapped from stereotypical perceptions about disabilities and unfounded speculations about threats to safety that emanate from them, and the fine line that might separate innocent from actionable conduct.

As noted above, the City claims that it is entitled to judgment as a matter of law because it has articulated a threat to public safety as a legitimate, nondiscriminatory reason for its action.[22] The Tenth Circuit requires that in order to invoke the statutory exception based on a "direct threat" to public safety, the City must demonstrate how specific individuals who seek to reside in a group home constitute a "direct threat." Applying a similar standard, the court in *Children's Alliance* found that defendant had offered no evidence that "residents of a homeless youth group home are more dangerous than if they lived with their relatives." 950 F.Supp. 1491, 1498. In fact, the record reveals that youth are supervised to a much greater degree than most of their peers, with a staff member awake throughout the night. The City already has one group home that operates under a special use permit for ten youth. While this fact might suggest that the City is willing to allow such homes "under appropriate circumstances,"[23] the City cites no evidence that the neighborhood surrounding the Keys home on 151st Street is more "appropriate" than the neighborhood in question here.[24] The record in fact suggests that the only factor which distinguishes the two neighborhoods is the degree of neighborhood opposition, framed in terms of housing values and public safety. But the Tenth Circuit has narrowly construed the public safety exception, and has held that exclusion may not be justified on the basis of "unfounded speculations about threats to safety." *Bangerter*, 46 F.3d at 1503–04. Although *Bangerter* dealt with special re-

quirements for group homes for developmentally disabled individuals, this Court believes that it applies with full force to all discrimination based on handicaps as set forth in the FHA.

On this record, the City has not demonstrated that it is entitled to judgment as a matter of law because it has articulated a threat to public safety as a legitimate, nondiscriminatory reason for its action. To the extent that the City advances this argument as an affirmative defense to plaintiff's discrimination claim, the Court overrules the City's motion for summary judgment and sustains that of Keys. The City simply has not demonstrated a "direct threat" to public safety through particularized evidence about individual residents. The Court recognizes that this burden is a high one and that it is perhaps all but impossible to meet when individual residents have not been identified. As the Court construes *Bangerter*, however, the law permits no lesser burden on these facts. 46 F.3d at 1503.

### 2. *Discriminatory Impact*

■ Keys does not clearly focus its claim of disparate impact disability discrimination under the FHA. Discriminatory impact involves an analysis of a facially neutral practice, policy or statute for its differential impact or effect on a particular group. *Bangerter*, 46 F.3d at 1501. The City asserts that Keys has failed to provide evidence of differential impact in this case. Because the Court believes that this case is more properly characterized as a

22. The City offers this matter as an affirmative defense, independent of the discrimination issue, and also seeks summary judgment on the basis that the stated reasons for its decision are not pretextual.

23. The City argues that just because a Keys house was approved in one location does not mean it is appropriate for every single family location. It points out that the property at issue in this case adjoins eight single family homes, that children walk past the home to go to elementary school, and that the neighborhood includes a day care center.

24. Morever, the City ordinance allows eight residents to reside in a group home for handicapped residents. None of the concerns expressed by the neighbors or the City Council explains why ten residents pose a direct threat to public safety when eight residents do not. On this record, the Court cannot discern how the tenancy of two additional unidentified residents would constitute a direct threat to the health or safety of other individuals or result in substantial physical damage to the property of others.

claim for discriminatory treatment or failure to accommodate, it will not attempt to structure plaintiff's argument on this point.

### 3. *Failure To Make Reasonable Accommodation*

▇ As an alternative or in addition to its other FHA claims, Keys argues that the City's denial of a special use permit violates the FHA provision for reasonable accommodation. Both Kansas statute and the city ordinance authorize eight residents in group homes for the handicapped. Keys claims that when the City refused to grant it a special use permit for two additional residents, it failed to make a reasonable accommodation for handicapped residents.[25]

▇ A "reasonable accommodation" involves changing some generally applicable rule so as to make its burden less onerous on the handicapped individual. *Bangerter*, 46 F.3d at 1501; *see also Oxford House, Inc., v. Township of Cherry Hill*, 799 F.Supp. 450, 462 n. 25 (D.N.J. 1992). The Court acknowledges the Tenth Circuit's statement that where a plaintiff does not challenge an ordinance that is generally applicable, but instead challenges an ordinance aimed at group homes for the handicapped, a claim for reasonable accommodation is simply inappropriate. *Bangerter*, 46 F.3d at 1502. In this case, however, the ordinance to some degree treats the handicapped in a preferential manner; thus the Court characterizes this aspect of plaintiff's claim as one for *further* accommodation.[26] *See* Brian Davis, *The State Giveth And The Court Taketh Away: Preserving The Municipality's Ability To Zone For Group Homes Under The Fair Housing Act Of 1988*, 59 Univ. Pittsburg L.Rev. 193 (statute that does not exclude handicapped persons from residential zone constitutes accommodation; request to vary from statute thus is for further reasonable accommodation) (citing *Smith & Lee Assoc's v. City of Taylor*, 13 F.3d 920, 930–931 (6th Cir.1993)).

▇ The circuit courts of appeal are split on the question whether plaintiff or defendant bears the burden of proving the reasonableness of a requested accommodation. *See Hovsons, Inc., v. Township of Brick*, 89 F.3d 1096, 1103 (3d Cir.1996) (defendant's burden to prove failure to accommodate reasonable); *Elderhaven, Inc., v. City of Lubbock*, 98 F.3d 175, 178 (5th Cir.1996) (plaintiff's burden to prove failure to accommodate unreasonable); *Bryant Woods, Inn v. Howard County*, 124 F.3d 597, 603 (4th Cir.1997). It appears that the Tenth Circuit would likely hold that plaintiff has the burden to produce evidence which supports a finding that an accommodation would be reasonable, and that the burden would then shift to defendant to prove that it was unreasonable. *Cf. Woodman v. Runyon*, 132 F.3d 1330, 1344 (10th Cir.1997) (in Rehabilitation Act case, plaintiff's burden with respect to the plausibility of reasonable accommodation is one of production only; once plaintiff has made showing that accommodation is possible, burden shifts to defendant to prove that accommodation would pose undue hardship). The question whether a requested accommodation is reasonable is a mixed question of law and fact "which primarily involves the con-

---

**25.** The Kansas statute on its face discriminates against individuals with handicaps: The statute allows eight residents with two staff members for group homes for handicapped residents, but allows ten residents in other groups homes. Plaintiff does not appear to directly challenge the validity of the state statute, however, and the Court will not address it.

**26.** Keys argues that the city ordinance is invalid on its face because it treats related dis-

abled persons more favorably than unrelated disabled group home residents. Keys appears, however, to make the reasonable accommodation claim as an alternative. Further, the city ordinance accommodates handicapped persons in some respects because it allows group homes for up to eight unrelated disabled persons while it otherwise limits unrelated persons to groups of five or fewer adults.

sideration of legal principles." *Rascon v. U.S. West Comm'n Inc.,* 143 F.3d 1324, 1333 (10th Cir.1998).

In its motion for partial summary judgment, Keys argues that it is entitled to judgment as a matter of law on its reasonable accommodation claim because it has shown that it cannot economically operate the home with eight rather than ten residents. In its cross-motion for summary judgment, the City does not specifically argue that is entitled to judgment as a matter of law on Keys' reasonable accommodation claim, although it does assert that Keys residents are not disabled and therefore are not entitled to protection under the FHA. In response to Keys' motion for summary judgment, however, the City asserts that the eight resident limit is rational, and further asserts that Keys has not provided documentation which supports Ms. Brown's statement that Keys does not receive sufficient income to pay costs allocable to the home if it is limited to eight residents.

The reasonable accommodation provision of the FHA requires plaintiff to show that the proposed accommodations would be reasonable and "necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3). Keys asserts that the City should have reasonably accommodated potential residents by changing the rule to allow ten residents in the group home. Plaintiff asserts that such an accommodation is necessary for the financial viability of the group home, pointing to statements by Mr. Ensz and the affidavit of Ms. Brown to the effect that Keys cannot economically operate this type of group home with eight residents. Keys has also produced evidence that SRS has a waiting list for youth who need this type of placement, and argues that this shows that the accommodation is necessary.

The record in this case creates a genuine issue of material fact whether the requested accommodation is reasonable and necessary. Thus Keys is not entitled to summary judgment on this point. *See*

*United States v. City of Taylor,* 872 F.Supp. 423 (E.D.Mich.1995), *aff'd in part, rev'd in part,* 102 F.3d 781 (6th Cir.1996) (where adult foster care home sought twelve residents and permit was required for more than six, failure to approve home in single family zone was failure to make reasonable accommodation; based on need and economic viability, however, nine rather than twelve was reasonable accommodation as to number of residents); *Parish of Jefferson v. Allied Health Care Inc.,* 1992 WL 142574 (E.D.La.1992) (refusal to grant variances to group home to operate with six rather than four residents was failure to accommodate in violation of 42 U.S.C. § 3604(f)). *But see Oxford House, Inc. v. City of Virginia Beach,* 825 F.Supp. 1251 (E.D.Va.1993) (suggesting in dicta that even if limiting the occupancy of group homes made the homes economically unfeasible, such fact was probably not sufficient to establish FHA discrimination).

Because factual issues remain as to whether group homes such as Keys need the requested accommodation (e.g., is it reasonable?) Keys' motion for summary judgment on its FHA disability reasonable accommodation claim is overruled. To the extent that the City raised this issue in its summary judgment motion, the City's motion is also overruled.

**B.** *Familial Status FHA Discrimination Claim*

 Plaintiff also asserts that defendant violated the FHA prohibition against discrimination on the basis of familial status. The FHA defines "familial status" as follows:

(k) "Familial status" means one or more individuals (who have not attained the age of 18 years) being domiciled with—

(1) a parent or another person having legal custody of such individual or individuals; or

(2) the designee of such parent or other person having such custody, with the written permission of such

parent or other person. The protection afforded discrimination on the basis of "familial status" shall apply to any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of 18 years.

42 U.S.C. § 3602(k).

In its motion for partial summary judgment, Keys argues that it is entitled to judgment as a matter of law on its familial status claim because Keys residents are entitled to the familial status protection of the FHA and the City discriminated against them on the basis of their protected status when it refused to allow them to live in the proposed group home. In its cross-motion for summary judgment, the City claims that it is entitled to judgment as a matter of law because potential Keys residents are not domiciled with a parent, a person having legal custody, or a designee of such person.

At the hearings before the Planning Commission and the City Council, Keys did not directly argue that it had the parental-type custody set forth in the FHA family status protection provision. Thus the Planning Commission's denial of the special use permit for ten residents can not be seen as overt discrimination on the basis of familial status. In the record on summary judgment, however, Keys has produced evidence that SRS has legal custody of most of the potential residents and that SRS designates Keys to care for the youth.

Under the Kansas Code for Care of Children, K.S.A. § 38–1501 *et seq.*, and the Kansas Juvenile Offenders Code, K.S.A. § 38–1601 *et seq.*, a court may place a child-in-need-of-care or a juvenile offender in the custody of the Secretary of SRS.[27] *See In re C.C.*, 19 Kan.App.2d 906, 908–09, 878 P.2d 865, 867 (1994). The record and the Kansas statutes thus compel the conclusion that Keys residents are in the custody of the Secretary, or the Commissioner, who then places the youth in a Keys home.

The City asserts that Keys children do not meet the FHA definition of "familial status" because they are not domiciled with "a parent or person having legal custody" of them. *See* 42 U.S.C. § 3602(k)(1). But the statute also provides familial status protection for individuals who are domiciled with "(2) the *designee* of such parent or other person having such custody, with the written permission of such parent *or other person.*" 42 U.S.C. § 3602(k)(2) (emphasis added). The Secretary of SRS or the Commissioner of Juvenile Justice is a person having legal custody of the Keys residents, and Keys is the designee of the Secretary or Commissioner. Thus, Keys residents are entitled to familial status protection under the FHA. *See Children's Alliance*, 950 F.Supp. at 1493 (W.D.Wash.

---

**27.** The Kansas Court of Appeals has explained the role of the court and the Secretary of SRS in determining the placement of a child in the custody of the Secretary:

> K.S.A. § 38–1563(e) states: "When the custody of the child is awarded to the secretary: (1) The court may recommend to the secretary where the child should be placed, but the court shall not have the power to direct a specific placement." ... [O]nce custody of a child is awarded to the Secretary, the court is not authorized under the Code for Care of Children to order a specific placement of that child.

*In re C.C.*, 19 Kan.App.2d 906, 908–09, 878 P.2d 865, 867 (1994).

The Juvenile Offenders Code places a similar restriction on the court's authority to direct placement of a child who is in the custody of the Juvenile Justice Commissioner. K.S.A. 38–1664(a) provides:

> When a juvenile offender has been placed in the custody of the commissioner, the commissioner shall notify the court in writing of the initial placement of the juvenile offender as soon as the placement has been accomplished. The court shall have no power to direct a specific placement by the commissioner, but may make recommendations to the commissioner. The commissioner may place the juvenile offender in an institution operated by the commissioner, a youth residential facility or a community mental health center. If the court has recommended an out-of-home placement, the commissioner may not return the juvenile offender to the home from which removed without first notifying the court of the plan.

1997) (refusing to reconsider decision that residents of group homes for youth are encompassed by the FHA definition of "familial status" where placement in group homes arises by "court transfer of custody to the State Department of Social and Health Services [ ], court transfer to a licensed child-placement agency, or by written consent of the legal custodian.").

 When the City denied the special use permit to Keys, it relied upon an ordinance which discriminated against Keys residents on the basis of familial status. The Ordinance defines family as follows:

one (1) or more persons who are related by blood or marriage, living together and occupying a single housekeeping unit with single kitchen facilities; or a group of not more than five (5) adult persons (excluding servants), living together by joint agreement and occupying a single housekeeping unit with single kitchen facilities, on a nonprofit, cost-sharing basis; or a group of eight (8) or fewer unrelated disabled persons including two (2) additional persons acting as house parents or guardians who need not be related to each other or to any of the disabled persons in residence.

Olathe City Ordinance 18.04.240. The ordinance allows any number of related persons, including an unlimited number of individuals under eighteen years of age, to occupy a single housekeeping unit. It does not allow group homes for unrelated children who live with a designee of a person having custody, however, unless those children are disabled and the home houses eight or fewer of them. The Ordinance thus allows the City to refuse dwelling access to potential residents because of familial status, in violation of FHA § 3602(k). Keys is entitled to summary judgment on its claim of FHA familial status discrimination, and the Court thus overrules defendant's summary judgment motion on this claim.

## II. 42 U.S.C. § 1983 Claims

 The City seeks summary judgment on Keys' claims under Section 1983, which allege violations of rights under the FHA and the federal constitution. The City first argues that Keys lacks standing to raise its claims under Section 1983. A Section 1983 claim must be based upon a "violation of plaintiff's personal rights, and not the rights of someone else." *Archuleta v. McShan,* 897 F.2d 495, 497 (10th Cir.1990). *Cf. Trujillo v. Board of County Commr's,* 768 F.2d 1186 (10th Cir.1985) (mother and sister of county jail inmate had standing to assert claims under 1983 for deprivations of their own rights of familial association based on alleged wrongful death of their son and brother while he was incarcerated). Keys might have third-party standing to assert the *constitutional* rights of potential residents, based on the relationship between Keys and potential residents. *See Terrell v. I.N.S.,* 157 F.3d 806 (10th Cir.1998) (third-party standing requires not only injury in fact and close relation to third party, but also hindrance or inability of third party to pursue his or her own claims). But Keys only alleges constitutional violations under the umbrella of its own Section 1983 claim, and it cannot raise the personal rights of others under Section 1983. The Court must thus examine each of the underlying constitutional claims to determine whether Keys has asserted a personal constitutional right.

### A. Equal Protection

 The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Keys asserts that the City's decision to deny a special use permit discriminated against potential group home residents on the basis of handicap. The Supreme Court has stated that handicapped persons are not a "suspect" class, however, and therefore allegedly discriminatory policies are analyzed under the "rational relation-

ship test." *See id.* at 448–49, 105 S.Ct. 3249. Keys could show discrimination under the rational basis test if it showed that the City denied the permit because of unsubstantiated fears or irrational prejudices. *See Bangerter,* 46 F.3d at 1503 n. 20. But Keys does not allege that the City has issued special use permits for more than eight residents to group homes for non-handicapped residents. Thus it has failed to allege that defendants have treated it differently than group homes for non-handicapped persons. *See generally Lyng v. Castillo,* 477 U.S. 635, 638–39, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986). Because Keys has failed to allege a factual basis for an equal protection claim, the City is entitled to summary judgment on Keys' section 1983 claim to the extent it rests on an equal protection violation.

### B. *Substantive Due Process*

 Defendant also seeks summary judgment on plaintiff's claim that the City violated its rights to substantive due process of law. Substantive due process requires plaintiff to show that defendant engaged in conduct that shocks the judicial conscience. *Uhlrig v. Harder,* 64 F.3d 567, 573 (10th Cir.1995). To satisfy this standard, "a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power;" rather, a plaintiff "must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.* Plaintiff has cited no case law, and the Court has found none, that would support a finding that the · City's decision to deny the special use permit was "shocking to the conscience." Defendant is thus entitled to summary judgment on Keys' Section 1983 claim to the extent that it is based upon a substantive due process claim.

### C. *Due Process/Taking*

 Keys owns the property for which the City denied the zoning permit, and it has standing to raise its due pro-

cess/taking claims under Section 1983. To the extent that Keys has raised a due process claim for taking without just compensation, however, it has not shown that denial of the special use permit lowered the value of the property or denied it an economically viable use of the property. Thus Keys has not established a factual basis for a Fifth Amendment taking claim. *See Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1179 (Fed.Cir.1994) (taking claim requires plaintiff show denial of an economically viable use of property as a result of the denial of permit). Further, to the extent that Keys has alleged a procedural due process claim, the record indicates that it received notice and an opportunity to respond. *See Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (procedural due process requires opportunity to be heard in meaningful time and meaningful manner). Thus the Court finds that the City is entitled to summary judgment on any Section 1983 claim based on a procedural due process/taking violation.

### D. *Federal Rights Under The FHA*

 The Court notes that the City does not specifically seek summary judgment on the Section 1983 claims which are predicated on a violation of Keys' federal rights under the FHA. The FHA grants standing to third parties. *See Housing Auth. of Kaw Tribe v. Ponca City,* 952 F.2d 1183, 1193 (10th Cir.1991). Thus Keys has standing to raise the FHA claims as independent claims and also as the basis for relief under Section 1983 claim. Defendant's motion for summary judgment on Keys' Section 1983 claim based on violations of its federal rights under the FHA is therefore overruled.

### III. *State Law Claim*

 Finally, the City asserts it is entitled to summary judgment on Keys' claim that it violated K.S.A. § 12–736 when it denied Keys a special use permit for a

home for ten youth. Keys does not seek summary judgment on this state law claim.

Section 12–736 provides that "persons with a disability shall not be excluded from the benefits of single family residential surroundings by any municipal zoning ordinance," K.S.A. § 12–736, and that "[n]o municipality shall prohibit the location of a group home in any zone or area where single family dwellings are permitted." *Id.* But the statute specifically defines a group home as follows:

> "any dwelling occupied by not more than 10 persons, including eight or fewer persons with a disability who need not be related by blood or marriage and not to exceed two staff residents who need not be related by blood or marriage to each other or to the residents of the home, which dwelling is licensed by a regulatory agency of this state."

K.S.A. § 12–736. The City argues that Keys' proposed home is for ten youth plus staff and that the Kansas statute did not require the City to allow Keys to locate its home in a residential area.[28] The statute is not a model of clarity. One way to read K.S.A. § 12–736 is that it allows group homes to be occupied by not more than ten persons, up to eight of whom may be disabled. Another way to read it is that ten non-disabled residents may reside in a group home while only eight disabled residents may do so. The statute is also unclear whether "staff residents" are counted among or in addition to the other persons who reside there. Further, the record in this case does not allow the Court to determine as a matter of law that Keys staff are even "residents" at all. As noted above, not all Keys residents will be disabled and in any group of ten residents, it is perhaps likely that eight or less will be disabled. Under one reading of the statute, Keys may be absolutely entitled to ten residents plus two staff: in a mixed

abled/disabled group, the home could have eight disabled residents, two non-disabled residents and two non-residential staff. Under another reading of the statute, Keys would not fare so well. Because the Court cannot determine as a matter of law that Keys staff are "resident" under the statute, it will not try to resolve these hypothetical issues. The City is not entitled to summary judgment on the state law claim.

**IT IS THEREFORE ORDERED** that *Plaintiff's Motion for Partial Summary Judgment Against Defendant City of Olathe, Kansas* (Doc. # 36) filed March 9, 1999, is **SUSTAINED** in part as to its claims that the City violated the FHA when it denied Keys' request to operate a Level V group home; specifically, that the City subjected potential residents to discriminatory treatment on the basis of familial status. Plaintiff's summary judgment motion is **DENIED** as to its claim that the City violated the FHA by discriminating against potential residents on the basis of their handicap, and that the City failed to reasonably accommodate the needs of the potential handicapped residents because factual issues remain.

**IT IS FURTHER ORDERED** that the *Motion For Summary Judgment Of Defendant City of Olathe* (Doc. # 38) filed March 12, 1999, is **SUSTAINED** in part, as to Keys' constitutional claims under Section 1983. Defendant's motion is otherwise **OVERRULED.**

Issues remaining for trial include the relief to which plaintiff is entitled.[29] At the status conference set for June 24, 1999, the parties should be prepared to discuss what other issues remain for trial.

---

28. The question whether the FHA pre-empts K.S.A. § 12–736 is not before the Court at this time.

29. As a practical matter, the Court notes that any relief under the familial status provision of the FHA will probably duplicate the relief available under the handicap discrimination provisions of the FHA and relief, if any, under state law.