**KEYS YOUTH SERVICES, INC., Plaintiff,**

v.

**CITY OF OLATHE, KANSAS, Larry Campbell, John Bacon, Bill Trout, Michael Copeland, and Gary Mitchell, Defendants.**

No. Civ.A. 98–2398–KHV.

United States District Court, D. Kansas.

Oct. 29, 1999.

---

James H. Ensz, Sarah G. Madden, Ensz & Jester, P.C., Kansas City, MO, for Plaintiff.

Anthony F. Rupp, Andrew M. DeMarea, Shughart, Thomson & Kilroy, Overland Park, KS, Roy T. Artman, Riling, Burkhead & Nitcher, Chtd., Lawrence, KS, for Defendants.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

Keys Youth Services, Inc. [Keys], a not-for-profit corporation which operates youth homes in Kansas, brings this action against the City of Olathe, Kansas [the City], alleging that the City violated the Fair Housing Act [FHA], 42 U.S.C. §§ 3601 *et seq.*, as amended by the Fair Housing Amendments Act of 1988, and Kansas law protecting persons with a disability, K.S.A. § 12–736.[1] This Court previously granted Keys' motion for summary judgment on its claim that the City violated the FHA by discriminating against potential residents on the basis of family status. *See Memorandum and Order* (Doc. # 54) filed June 23, 1999. The parties have stipulated that plaintiff sustained $55,676.79 in damages on account of that violation.[2]

The case was tried to the Court on July 20 and 21, 1999. The issues before the Court are whether, in denying Keys a special use permit, the City (1) violated the FHA by discriminating against potential residents on the basis of handicapped status or failing to reasonably accommodate potential handicapped residents, and (2) violated K.S.A. § 12–736 by failing to allow ten handicapped residents. Having considered the evidence presented at trial, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure.[3]

### FINDINGS OF FACT

Keys is a not-for profit corporation which operates group homes in Johnson

---

1. On June 23, 1999, the Court granted in part the *Motion For Summary Judgment Of Defendant City of Olathe* (Doc. # 38) filed March 12, 1999, on plaintiff's constitutional claims under 42 U.S.C. § 1983. *See Memorandum and Order* (Doc. # 54).

2. The parties have stipulated that if the Court finds the City liable on plaintiff's other claims, the damages would be identical. The parties also have stipulated that plaintiff's reasonable attorneys fees would be within a range not to exceed $50,000. Plaintiff has dismissed with prejudice all claims for punitive damages.

3. Also before the Court are the *Motions In Limine Of Defendant City of Olathe* (Doc. # 67) filed July 16, 1999, and the *Motion For Judgment As A Matter Of Law Of Defendant City Of Olathe* (Doc. # 71) filed July 21, 1999. Defendant's motions in limine request that the Court exclude five categories of evidence from being heard by the jury. Because this matter was ultimately tried to the Court, the Court overrules the motions in limine. The Court sustains defendant's motion for judgment as a matter of law for the reasons stated herein.

County, Kansas. The homes provide residential care for youths between the ages of 12 and 17 who have been abused, neglected or abandoned and who are under the supervision and direction of the Kansas Department of Social and Rehabilitation Services. The Court has found that at least some potential Keys residents will be handicapped under the FHA.[4] *See Memorandum and Order* (Doc. # 54) filed June 23, 1999.

On March 3, 1998, Keys contracted to purchase a home at 605 E. Harold in Olathe, Kansas. The home is located on more than one acre of land in an area which is zoned for single family residences. Keys proposed to use the home to house ten unrelated adolescent males and two or three adult staff members. The City zoning ordinance classified the proposed home as a residential care facility, specifically, a group board home for minors. *See* Olathe City Ordinance §§ 18.76.020, 18.06.305.[5] On March 13, 1998, Keys applied to the City for a special use permit to operate the group home.

On March 19, 1998, the City issued the required notice of a public hearing before the Planning Commission to hear evidence regarding the requested special use permit (SU–11–98). In response, more than 85 percent of the property owners within 200 feet of the Keys property filed a protest petition. The filing of that petition triggered a supermajority voting requirement under Olathe City Ordinance § 18.12.130, requiring that 75 percent of the City Council approve the special use permit. The Council has seven members and six members therefore had to approve the application.

---

4. The Fair Housing Act Amendments use the term "handicapped," while the Americans with Disabilities Act uses the term "disabilities." Because case law interpreting the ADA is also helpful in applying the FHA, the Court uses the terms interchangeably.

5. Section 18.06.305 of the ordinance defines a "Group board home for minors" as:

  a residential facility for six or more persons under 18 years of age who for various reasons cannot reside in their natural home and where 24 hour adult care, supervision and consultation exists under license of the Kansas Secretary of Health and Environment, except where it is a group home as defined by [K.S.A. § 12–736].

  K.S.A. § 12–736 provides in part:
  (a) It is hereby declared to be the policy of the state of Kansas that persons with a disability shall not be excluded from the benefits of single family residential surroundings by any municipal zoning ordinance, resolution or regulation.
  (b) For the purpose of this act:
  (1) 'Group home' means any dwelling occupied by not more than 10 persons, including eight or fewer persons with a disability who need not be related by blood or marriage and not to exceed two staff residents who need not be related by blood or marriage to each other or to the residents of the home, which dwelling is licensed by a regulatory agency of this state;

  (2) 'municipality' means any township, city or county located in Kansas;
  (3) 'disability' means, with respect to a person:
  (A) A physical or mental impairment which substantially limits one or more of such person's major life activities;
  (B) a record of having such an impairment; or
  (C) being regarded as having such an impairment. Such term does not include current, illegal use of or addiction to a controlled substance, as defined in section 102 of the controlled substance act (21 U.S.C. § 802)

  .   .   .   .   .

  (e) No municipality shall prohibit the location of a group home in any zone or area where single family dwellings are permitted. Any zoning ordinance, resolution or regulation which prohibits the location of a group home in such zone or area or which subjects group homes to regulations not applicable to other single family dwellings in the same zone or area is invalid. Notwithstanding the provisions of this act, group homes shall be subject to all other regulations applicable to other property and buildings located in the zone or area that are imposed by any municipality through zoning ordinance, resolution or regulation, its building regulatory codes, subdivision regulations or other nondiscriminatory regulations.

On April 13, 1998, the Planning Commission held a public hearing to consider plaintiff's application.[6] Representatives of Keys appeared and presented witnesses who spoke in favor of the permit. Neighbors presented witnesses who spoke in opposition to the permit. The City planning staff recommended that the application be approved, notwithstanding the neighborhood opposition, because the proposed special use would provide a needed service for at-risk youth in the community and was consistent with the City's comprehensive plan. After hearing from both sides, however, the Planning Commission voted to deny the special use permit by a 4–2 vote. On May 5, 1998, the City Council considered the issue and by a 6–1 vote decided to return plaintiff's application to the Planning Commission. Ten days later, on May 15, 1998, Keys closed on its purchase of the property.

On June 8, 1998, the Planning Commission met to reconsider plaintiff's permit application. The Commission denied the permit by a 6–3 vote, and listed factors in support of the denial. The Commission set forth two major factors which, it determined, would detrimentally affect nearby property: a risk to public safety and a decrease in the value of neighboring property.[7]

The Planning Commission also found that "[t]he relative gain to the public health, safety, and welfare by the destruction of the value of plaintiff's property (neighboring property) as compared to the hardship imposed upon the individual landowner (KEYS)" was as follows:

a. Some neighbors indicated that while the KEYS program for youths is needed, they argued that it is not appropriate for this neighborhood due to public safe-

6. The complaint refers to the Planning Commission and the Zoning Commission interchangeably. Throughout this order the Court refers to the relevant body as the Planning Commission.

7. The Commission specifically set forth the factors as follows:

a group home for youth at this location constitutes problems of public safety to neighbors and children and the location of the group home in this area will decrease the value of properties in this area.

[ ] Regarding public safety:

(1) Neighbors pointed out that it may not be safe for them or children to walk in the neighborhood. The neighbors referred to police calls to other KEYS group homes in Johnson County.

(2) There were 72 police calls involving KEYS homes in Johnson County in 1997. 5 calls involved assault or battery, six calls involved disorderly conduct, six calls involved thefts, four calls involved criminal damage to property, and two calls related to possession of marijuana.

(3) Neighbors reported very little crime in this neighborhood and the City's police cars are rarely seen in this neighborhood.

(4) The type of police calls indicates that there are youths in the KEYS program who have behavioral problems, who could physically threaten any person (dis-

orderly conduct, battery, assault, and criminal damage),and who could steal or damage property (criminal damage. and theft).

(5) There are several daycare centers, two elementary schools in the general area, and young families with children in the general area, presenting a major safety concern of juvenile adolescents with behavioral or emotional problems being placed in the KEYS home at this location.

(6) Juvenile offenders are found to be the most difficult, unpredictable and by far the most dangerous people to deal with because of their cavalier behavior.

(7) Even with 24–hours supervision in 1997, there were police calls for KEYS homes; reports show 32 youths ran away from the homes and several youths were found with marijuana. Neighbors pointed out that runaways may steal automobiles or other means of transportation, such as a bicycle, to run away.

(8) There is no guarantee that KEYS will not accept juvenile offenders or juveniles with a felony background into the KEYS home. Regarding decrease in value of property, a real estate agent familiar with the area indicated that the price of neighboring properties will decrease if a KEYS home is located at 605 E. Harold Street.

Ex. D, p. 405–06.

ty concerns and effect upon property values.

b. Police calls at KEYS homes in Johnson County in 1997 indicated that public safety is a serious concern. Public safety will be affected by the location of a KEYS home for youths with emotional and behavioral problems. The neighbors expressed concerns about safety to the senior citizens and children living and walking in the neighborhood. They also expressed concerns about increased crime in the neighborhood where there had been no criminal activity.

c. On the studies on group homes regarding the effect of group homes on public safety and property valuation in the general area, there was no reference if any study focused on group homes for youths.

d. The neighbors have said that a real estate broker indicated that due to the KEYS proposal, property values will decrease.

*Id.* at 406.

The Planning Commission also concluded that the proposed residents were not "handicapped" and that the FHA permitted the City to deny the application, as follows:

Under 42 U.S.C. Sec. 3604(f)(9) of the FHA regarding public safety concerns, nothing in the FHA requires that the KEYS home be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others. Furthermore, the 10th Circuit Court [in] *Bangerter* stated that housing can be denied altogether for those same reasons.

Pursuant to two court cases, *Act I Inc.,* and *Sunderland Family Treatment Services,* the youths who present problems

of physical abuse, neglect, sexual abuse, or "child in need of care" but not abuse or neglect, and being placed in the KEYS group home are not considered "handicap" [sic] under the FHA.

*Id.* at 407.

On July 7, 1998, the City Council again considered plaintiff's application. At a public hearing, James Ensz, president of the Keys board, presented evidence in support of the application. Keys took the position that it had no duty to present evidence because as a matter of law it was entitled to use its property as a group home. The City's law firm advised the City that it should issue the permit because the residents might be considered handicapped and thus entitled to reasonable accommodation. The Council rejected the application, however, by a 4–3 vote.

The Keys mission is to provide professional treatment and continued support under family-like conditions for youths who have emotional problems which result from abuse, abandonment or neglect. The Kansas Department of Social and Rehabilitation Services (SRS) places most of the Keys youth. SRS refers juvenile offenders, children-in-need-of-care, and youth who have problems which stem from physical abuse, neglect, truancy, and sexual abuse. Most Keys residents have developed emotional problems as a primary result of environmental and cultural factors.

SRS categorizes youth behavioral problems from Level III to Level VI. Level VI is the most severe category; and youth who are in this category must be in lockdown facilities. Keys proposed to operate a Level V home on the property which was the subject of its special use permit application. When Keys applied for its special use permit on Harold Street, it was already operating a Level V group home for ten male youth in Olathe on 151st Street. Level V homes include children who exhibit antisocial and aggressive behavior in-

cluding fighting, theft, vandalism, assault and battery. Level V youth require a controlled environment with a high degree of supervision and intensive services, and have usually failed in other less structured environments. Many of the residents will also have behavioral problems. Parents and teachers describe such youth as uncooperative, argumentative, dishonest, cruel, aggressive, moody, disruptive and sometimes assaultive. Level V youth may have previously resided in a Level VI facility.

To participate in the Keys program, residents must not be in an active episode of chemical dependency, must not have past behavioral patterns such as murder, sexual assault, robbery, or repeated violent acts against self or others, and must not have been diagnosed with *severe* emotional disturbances or psychotic conditions that would require long term treatment. Admission standards do not require that Keys residents possess physical or mental impairments, however, or any other disabilities or handicaps. Residents must have a minimum full scale IQ of 70 and must be able to function with abstract concepts and token economies. Further, at any given time, Keys may or may not have residents who are physically impaired.[8]

Of Keys youth, 95 percent or more have recognized mental problems. While in the Keys program, they receive ongoing psychological or psychiatric treatment. Keys is not, however, a program for the mentally handicapped. Dr. Edward Neufeld, a licensed psychologist who treats Keys residents in Johnson County, spoke at the first Planning Commission hearing on April 13, 1998. Dr. Neufeld provided specific information about typical residents of Keys homes. He stated that one resident had a specific learning disability which caused

frustration and behavioral problems, and noted that such problems are very common with children with attention deficit disorder or specific learning disabilities. Dr. Neufeld stated that while most Keys residents would not be academically and intellectually handicapped, a learning disability can become a behavioral problem for a normally functioning young person.

At the Planning Commission hearings, neighbors presented testimony relating to public safety concerns. On June 15, 1997, residents of the Keys home on 151st Street sneaked out and went on a "crime spree," setting a car on fire, burglarizing more than 20 cars, breaking into several businesses, stealing, shoplifting, defecating on a car, and vandalizing real and personal property. At the time, the home had no staff on waking duty at night. After the incident, Keys hired additional night staff at its Level V homes, and no night-time incidents have recurred. In addition to the one incident, however, the Keys staff at 151st Street has reported five runaways, four batteries, three assaults, and two cases of criminal damage to property. Keys requires its staff to report to police even minor incidents which involve residents. Pursuant to this policy, Keys staff reported all of the foregoing incidents even though both the perpetrators and the victims, if any, were Keys residents.

At the Planning Commission hearing on April 13, a neighbor, Loy Hayden, noted that by its own admission, Keys could not guarantee that youth with extensive criminal backgrounds would not be placed in the home at 605 E. Harold. Hayden also expressed concern that since juvenile crime records are not public, no one except Keys would know who was being placed in the home or what their criminal records were. Ensz countered that Keys would not accept a youth if it had any reason to

---

**8.** Keys has not made special physical accommodations for individuals with physical impairments.

believe that he would be dangerous to himself or others. Minutes of Meeting on April 13, 1998, p. 95.

Also at the Planning Commission hearing on April 13, neighbors pointed out that several schools and day care centers are located in the area and expressed concern about the safety of neighborhood children. *Id.*, p. 89, 91. A federal probation officer who lives in the neighborhood stated that juvenile offenders are the most difficult, unpredictable, and by far the most dangerous of offenders. Other neighbors expressed concern that the home would inject criminals into the neighborhood. *Id.* at 89–90. One neighbor stated that he had worked with Keys children in the school district, that they are not constantly supervised and that they sometimes run away. He added that the homes sometimes have problems with alcohol and drug use. *Id.* at 90–91. Another neighbor said that he had reviewed public records which showed that a Keys home had nine runaways in 1997.[9] Shelly Shaw, a teacher at Olathe North High and Oregon Trail Middle school, stated that she had extensive experience with Keys students, that she would be scared to live next to a Keys home, and that she was afraid for nearby elementary and day care children. She reported that based on her teaching experience, it was obvious that some Keys youth were involved in gang activity. *Id.* at 92. Frank Brockway, an immediate neighbor of the proposed home, stated that in his work as an employee of SRS, he had dealt with one Keys resident who had done considerable property damage around the home and another one who had escaped, stolen a car, and broken into Olathe businesses. *Id.* at 93.

Police records for Shawnee, Kansas indicate that the Keys home in that city has generated calls which involve runaways, disorderly conduct, battery, theft, burglary, escape, and other offenses. All of the police calls originated, however, in the home itself.

At the Planning Commission hearing on April 13, the Planning Commission discussed the location of the Keys property at 605 E. Harold. On the east, the property abuts three single family homes. On the south, it adjoins four single family homes. On the west, it adjoins two single family homes. The north property line is Harold Street. Two homes are located across the street from the Keys property at that point. Neighbors (including a realtor), stated that the Keys home would reduce the value of nearby property. Robert Smith, a realtor, stated that sellers in the area would have to disclose to potential buyers the existence of the group home. Planning Commission staff, however, presented information from the *Zoning and Planning Law Handbook* by Daniel Lauber. That handbook reviewed 50 studies which considered the impact of group homes on property values and concluded that group homes do not reduce the values of surrounding property. Keys also produced evidence that generally a group home is very well maintained.

Keys program director Elizabeth Barker explained that when a Keys home is full and fully staffed, the staffing ratio is at least two staff members to ten residents. Sometimes the staffing ratio is one to seven. While no college degree is required, staff must be 21 years old. The manager and assistant manager of each home are expected to have college degrees in the

---

**9.** For a one-year period, police records in Mission, Kansas reflect 23 police calls from Keys for (among other things) disorderly conduct, runaways, assault, battery, criminal possession of explosives, possession of marijuana and stolen property. Except for a bicycle which was taken from a school and immediately turned over to police, none of the reports involved personal injury or property damage to neighbors.

social services area.[10]

At the public hearings Keys representatives stated that the residents would be predominantly and preferentially from Johnson County, that Keys would closely monitor them around the clock, and that they would not have access to vehicles, drugs or weapons.

SRS reimburses Keys for the children whom it houses. The daily reimbursement rate is between $70.00 and $72.35. Keys spends the reimbursement on housing, supervision, transportation, basic living expenses, food, clothes, recreation and school supplies. Keys asserts that if it operates the homes efficiently and at high capacity, it can generate annual income of $60,492.85, and that it can spend its income within the entire Keys system to improve the overall quality of life of all residents, increase wages, and increase its cash reserve.

### CONCLUSIONS OF LAW

■ A plaintiff may establish discrimination under the FHA by showing either (1) that defendant intended to discriminate against the handicapped ("discriminatory intent" or "disparate treatment") or (2) that defendant's otherwise neutral action has an unnecessarily discriminatory effect ("disparate impact"). See *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir.1995); *Doe v. City of Butler, Pa.*, 892 F.2d 315, 323 (3d Cir.1989); *Potomac Group Home Corp. v. Montgomery County, Maryland*, 823 F.Supp. 1285, 1295 (D.Md.1993). Although some courts have identified a third type of case where a

challenged practice discriminates against the handicapped on its face, *see Potomac*, 823 F.Supp. at 1295, facially discriminatory actions are just one type of intentional discrimination or disparate treatment. *See Bangerter*, 46 F.3d at 1500–01 (ordinances which discriminate on their face are properly analyzed as type of intentional discrimination); *see International Union, United Auto. Aerospace & Agricultural Implement Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 197–200, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991) (in employment case, treating facially discriminatory policy as intentional discrimination).

### I. *Intentional Discrimination*

■ In order to prove that the City intentionally discriminated against Keys because of the handicapped status of some potential residents, Keys must show that its decision was motivated to some degree by unjustified consideration of the disabled status of the individuals affected by the decision.[11] *Honce v. Vigil*, 1 F.3d 1085, 1088 (10th Cir.1993) (ultimate question in disparate treatment case is whether defendant intentionally discriminated against plaintiff); *see Bryant Woods Inn, Inc. v. Howard County*, 911 F.Supp. 918, 928 (D.Md. 1996); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir.1995) (citations omitted) (disparate treatment analysis involves differential treatment of similarly situated persons or groups).

Keys has not produced any direct evidence that in denying the special use permit, the City intended to discriminate against Keys—even in part—because of

---

**10.** At her deposition, Linda Brown, the executive director of Keys, testified that to her knowledge, in 30 years of Keys' existence, Keys residents had no history of bothering neighbors. She also testified that 80 percent of the youths successfully graduate from the Keys home and are reintegrated with society without further intervention. Of course, the City did not have Ms. Brown's testimony before it in making its decision.

**11.** Other than failure to reasonably accommodate, which some courts have characterized as simply one possible aspect of a disparate impact claim, plaintiff did not adequately articulate a claim of disparate impact as to handicap under the FHA. *See Memorandum And Order* (Doc. # 54) filed June 23, 1999, at 31–32.

the handicapped status of the proposed residents. In ruling on summary judgment in this case, the Court therefore stated that the issue for trial was "whether the City's stated public safety concerns were pretextual and, if its explanation is unworthy of credence," whether an inference of intentional discrimination should be drawn from that finding. *See Memorandum and Order* (Doc. # 54) filed June 23, 1999, at 29; *see also Bryant Woods, Inn*, 124 F.3d 597.

Plaintiff argues that it is entitled to judgment on disparate treatment claims under the FHA because the City did not follow the recommendations of its staff and the advice of its attorneys, but rather relied on the objections of the neighbors. In contrast, the City claims that it is entitled to judgment because it has produced evidence that it denied the permit because of a threat to public safety, which is a legitimate nondiscriminatory reason.

■ As the Tenth Circuit noted in *Bangerter*, Section 3604(f)(9) of the FHA permits reasonable restrictions on the terms or conditions of housing (as well as outright denial of housing) if justified by public safety concerns.[12] *Bangerter*, 46 F.3d at 1503. In *Bangerter*, however, the Tenth Circuit expressly cautioned that "[denial of housing] based on concerns for the protection of the disabled themselves or the community must be individualized 'to the needs or abilities of particular kinds of developmental disabilities,' *Marbrunak, Inc. v. City of Stow, Ohio*[ ], 974 F.2d 43, 47 (6th Cir.1992), and must have a 'necessary correlation to the actual abilities of the person'" *Potomac Group Home*, 823 F.Supp. at 1300. *Id.* Thus a decision based on unfounded fears of citizens would

be discriminatory. *Id.; cf. Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810 (4th Cir.1995) (zoning authority did not discriminate merely by influence of community pressure based on legitimate land use issues).

Analysis of the public safety issue in this case is complicated by the fact that only some of the residents will be handicapped and neither Keys nor the Court can know how many residents will be handicapped or what their specific disabilities will be. Keys admits that residents will have "serious behavioral problems which are typically anti-social and aggressive." Both handicapped and non-handicapped youth have been known to exhibit anti-social and aggressive behavior, but the handicapped residents are entitled to protection from discrimination while the others are not. The FHA prohibits discrimination on the basis of handicap, not on the basis of behavior. As the Court noted in its summary judgment order:

> [T]he fundamental question is whether the City denied the permit because potential residents are handicapped or, to borrow the vernacular, because they are hoodlums or potential hoodlums. Ten adolescents who exhibit anti-social, aggressive behavior can certainly present legitimate public safety issues. The more difficult question is whether the City viewed such issues as ones related to the disabilities of some residents— whether it based its decision on unfounded assumptions about the impact of people with disabilities, an action that the FHA forbids.

*Memorandum and Order* (Doc. # 54) filed June 23, 1999, at 29.

Keys points to testimony which suggests that the Council voted to deny the special

12. The City points out that "the FHA expressly allows discrimination rooted in public safety concerns, when it provides that '[n]othing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others.'" *Bangerter*, 46 F.3d at 1503 (quoting 42 U.S.C. § 3604(f)(9)).

permit because of political considerations. But weighing all of the evidence, the Court finds that the City Council denied the permit because it reasonably determined that the residents of the home would pose a safety threat to residents of the neighborhood, as well as concerns about a negative effect on property values. The City's proffered reasons for denying the special use permit were not a mere pretext for discriminating against the handicapped. *See Contreras v. City of Chicago,* 920 F.Supp. 1370, 1399 (N.D.Ill.1996) (critical inquiry is whether elected official is appropriately responding to legitimate concern or is unlawfully catering to and effectuating the constituent's bigotry). Rather, the City had legitimate concerns which centered on the potential for increased crime and reduced property values. The concerns were supported by evidence of assault, battery and theft by residents at other Keys homes, as well as by the SRS description of Level V home residents as dishonest, cruel, aggressive, and sometimes assaultive. It was reasonable for the City Council to conclude from the evidence that a group home with ten Level V residents in close proximity to many other residences would pose an increased risk of crime, including crimes against persons. The City is therefore entitled to judgment on plaintiff's claim of intentional discrimination under the FHA based on handicapped status.

## II. *Reasonable Accommodation*

█ Keys also argues that in denying the special use permit the City violated the FHA requirement of reasonable accommo-

dation. Both the Kansas statute and the Olathe city ordinance authorize *at least* eight residents in group homes for the handicapped. The City ordinance defines a "group board home for minors" as "a residential facility for six or more persons under 18 years of age" unless it is a group home as defined by K.S.A. § 12–736. Olathe City Ordinance § 18.06.305. K.S.A. § 12–736(b)(1) defines "group home" as "not more than 10 persons, including eight or fewer persons with a disability." Keys claims that when the City refused to grant it a special use permit for ten—two more than the "eight or fewer" persons prescribed in K.S.A. § 12–736(b)(1)—it failed to make a reasonable accommodation for handicapped residents. The City's primary argument on this point is that the potential residents are not handicapped, an argument which the Court has already rejected as to some proposed residents. *See Memorandum and Order* (Doc. # 53) filed June 23, 1999, at 23–24. The City further argues that the eight resident limit is rational, and that Keys has not shown that an accommodation for two additional residents is necessary or reasonable.

█ A "reasonable accommodation" involves changing some generally applicable rule so as to make it less burdensome on the handicapped individual. *Bangerter,* 46 F.3d at 1501; *see also Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. 450, 462 n. 25 (D.N.J.1992). In ruling on the cross-motions for summary judgment in this case, the Court noted that plaintiff's claim is properly characterized as one for further accommodation.[13] *See Memorandum and Order* (Doc. # 54) filed

13. The Court reasoned as follows:
   Where a plaintiff does not challenge an ordinance that is generally applicable, but instead challenges an ordinance aimed at group homes for the handicapped, a claim for reasonable accommodation is simply inappropriate. *Bangerter,* 46 F.3d at 1502. In this case, however, the ordinance to some degree treats the handicapped in a preferential manner; thus the Court char-

   acterizes this aspect of plaintiff's claim as one for *further* accommodation. *See* Brian Davis, *The State Giveth And The Court Taketh Away: Preserving The Municipality's Ability To Zone For Group Homes Under The Fair Housing Act Of 1988,* 59 Univ. Pittsburg L.Rev. 193 (statute that does not exclude handicapped persons from residential zone constitutes accommodation; request to vary from statute thus is for further rea-

June 23, 1999 at 32–33. The Court also found that plaintiff has the burden to produce evidence which supports a finding that an accommodation would be necessary and reasonable, and that the burden then shifts to defendant to prove that the proposed accommodation was unreasonable. *See id.* at 33–34 (citing *Woodman v. Runyon*, 132 F.3d 1330, 1344 (10th Cir.1997)) (in Rehabilitation Act case, once plaintiff has shown that accommodation is possible, burden shifts to defendant to prove that accommodation would pose undue hardship). Whether a requested accommodation is reasonable is a mixed question of law and fact which primarily involves the consideration of legal principles. *Rascon v. U.S. West Communications, Inc.*, 143 F.3d 1324, 1333 (10th Cir.1998).

■ The reasonable accommodation provision of the FHA requires plaintiff to show that the proposed accommodation would be reasonable and "necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3). Under the FHA, "equal opportunity" means giving handicapped individuals the right to choose to live in single-family neighborhoods. As the Sixth Circuit Court of Appeals has noted:

> [T]he Act prohibits local governments from applying land use regulations in a manner that will exclude people with disabilities entirely from zoning neighborhoods, particularly residential neighborhoods, or that will give disabled people less opportunity to live in certain neighborhoods than people without disabilities. Moreover, the phrase "equal opportunity," at least as used in the FHAA, is concerned with achieving equal results, not just formal equality.

The statute links the term "necessary" to the goal of equal opportunity. *See* 42

U.S.C. § 604(f)(3)(B) ("accommodation ... necessary to afford ... equal opportunity"). Plaintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice.

*Smith & Lee Assocs., Inc. v. City of Taylor, Michigan*, 102 F.3d 781, 795 (6th Cir. 1996) (citations omitted).

Keys argues that the accommodation of two additional residents is necessary for the financial viability of the home. In determining whether accommodation was necessary, Courts have considered whether a minimum size may be essential to the success of the venture. *See Smith & Lee*, 13 F.3d at 931; *see also Brandt v. Village of Chebanse*, 82 F.3d 172, 174 (7th Cir. 1996) (for the handicapped, "joint living arrangements are essential, [and] some minimum size may be essential to the success of the venture").

At trial, Keys presented the following evidence supporting its argument that ten residents are essential to the financial viability of the proposed home: SRS reimburses Keys on a daily per capita rate. The incremental expense of housing ten as opposed to eight residents is small, because except as to food and other incidental costs, the cost to Keys is the same. No additional staff or housing is required. If Keys operated with ten residents, the home would generate annual "income" of approximately $60,492, which Keys would then use to improve services within the Keys system, raise employee salaries, and increase cash reserves.

Although the trial evidence might be sufficient on which to find that the accommodation of ten rather than eight residents is necessary, Keys failed to produce this evidence to the Planning Commission or to the City Council. The only evidence

sonable accommodation) (citing *Smith & Lee Associates, Inc. v. City of Taylor, Michigan*, 13 F.3d 920, 930–931 (6th Cir.1993)).

*See Memorandum and Order* (Doc. # 54) filed June 23, 1999, at 32–33.

of a need for a reasonable accommodation presented to these two bodies was that SRS reimburses Keys on a daily per capita rate, and that SRS has a waiting list for youth who need a Level V placement. Proof that Keys is paid on a per capita basis, and that this type of group home offers a needed service does not compel a finding, however, that ten rather than eight residents is a necessary accommodation.

■ Although Keys may find that it is economically advantageous to operate a home with ten rather than eight residents, the City Council had no evidence before it on which to find that the home could not operate with fewer than ten residents or that the requested accommodation is necessary to its financial viability. Under the FHAA, Keys had the burden of showing the City Council the need for a reasonable accommodation before seeking judicial relief. *See Oxford House–A v. City of Univ. City*, 87 F.3d 1022, 1024–25 (8th Cir.1996) (those seeking an accommodation under the FHAA have burden to request accommodation before seeking relief in a judicial forum). After carefully weighing all of the evidence in this case, the Court therefore finds that Keys did not meet its burden of showing the City Council that the accommodation was *necessary. See United States v. City of Taylor*, 872 F.Supp. 423 (E.D.Mich.1995), *aff'd in part, rev'd in part*, 102 F.3d 781 (6th Cir.1996) (where adult foster care home sought 12 residents and permit was required for more than six, failure to approve home in single family zone was failure to make reasonable accommodation; based on need and economic viability, however, nine rather than 12 was reasonable accommodation as to number of residents); *Parish of Jefferson v. Allied Health Care Inc.*, 1992 WL 142574 (E.D.La.1992) (refusal to grant variances to group home to operate with six rather

than four residents was failure to accommodate in violation of 42 U.S.C. § 3604(f)). Keys has failed to show that it presented to the City evidence of the required linkage—that the proposed accommodation is necessary to provide potential residents an equal opportunity for housing in the community. The City is therefore entitled to judgment on plaintiff's reasonable accommodation claim.

### III. *State Law Claim*

■ Plaintiff urges the Court to find as a conclusion of law that the City of Olathe violated K.S.A. § 12–736 by denying Keys' application for a special use permit for ten residents.[14] In ruling on the parties' summary judgment motions, the Court noted that

> [t]he statute is not a model of clarity. One way to read K.S.A. § 12–736 is that it allows group homes to be occupied by not more than ten persons, up to eight of whom may be disabled. Another way to read it is that ten non-disabled residents may reside in a group home while only eight disabled residents may do so. The statute is also unclear whether "staff residents" are counted among or in addition to the other persons who reside there. Further, the record in this case does not allow the Court to determine as a matter of law that Keys staff are even "residents" at all. As noted above, not all Keys residents will be disabled and in any group of ten residents, it is perhaps likely that eight or less will be disabled. Under one reading of the statute, Keys may be absolutely entitled to ten residents plus two staff: in a mixed abled/disabled group, the home could have eight disabled residents, two non-disabled residents and two non-residential staff. Under another reading of the statute, Keys would not fare so well. Because the

---

**14.** Defendant asserts that at the status conference, plaintiff's counsel advised the Court that

plaintiff did not intend to pursue claims based on K.S.A. § 12–736 or 42 U.S.C. § 1983.

Court cannot determine as a matter of law that Keys staff are "residents" under the statute, it will not try to resolve these hypothetical issues. The City is not entitled to summary judgment on the state law claim.

*Memorandum and Order* (Doc. # 54) filed June 23, 1999, at 41–42. Plaintiff ignored the Court's invitation to present facts as to whether staff should be considered "residents" under the statute. Rather, plaintiff simply urges the Court to find that the "act as reasonably interpreted prohibited Defendant City of Olathe from applying its ordinances, or taking any action to prevent Plaintiff Keys from operating its planned group home for persons with a 'disability' in a family residential neighborhood." *Plaintiff's Proposed Findings of Fact And Conclusions of Law* (Doc. # 77) filed July 29, 1999, at 9. Keys also, however, specifically asserts that K.S.A. § 12–736 requires the City to allow Keys to operate a group home housing *eight* handicapped persons. Keys has not clarified how refusal to allow *ten* residents would violate K.S.A. § 12–736. Because plaintiff failed to support its state law claim, the Court finds that it has not shown by a preponderance of the evidence a violation of the statute.

**IT IS THEREFORE ORDERED** that the *Motion For Judgment As A Matter Of Law Of Defendant City Of Olathe* (Doc. # 71) filed July 21, 1999, be and hereby is **SUSTAINED.** Defendant is entitled to judgment on plaintiff's claims of discrimination on the basis of handicapped status under the FHA, and on plaintiff's claim that the City violated K.S.A. § 12–736. The Clerk is directed to enter judgment consistent with this and prior orders in this case.

**IT IS FURTHER ORDERED** that the *Motions In Limine Of Defendant City of Olathe* (Doc. # 67) filed July 16, 1999, be and hereby are **OVERRULED.**