**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 11 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

KEYS YOUTH SERVICES, INC., a
Kansas not-for-profit corporation,

    Plaintiff-Appellee/
    Cross-Appellant,

v.

CITY OF OLATHE, KANSAS, a
Municipal corporation,

    Defendant-Appellant/
    Cross-Appellee.

Nos. 99-3387 & 99-3388

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 98-CV-2398)

---

Anthony F. Rupp (Andrew M. DeMarea with him on the briefs) of Shughart
Thomson & Kilroy, P.C., Overland Park, Kansas, for Appellant/Cross-Appellee
City of Olathe, Kansas.

James H. Ensz of Ensz & Jester, P.C., Kansas City, Missouri, for Appellee/Cross-
Appellant Keys Youth Services, Inc.

---

Before **LUCERO** , **McKAY** , and **MURPHY** , Circuit Judges.

---

**McKAY** , Circuit Judge.

Defendant Olathe City, Kansas, appeals from the district court's summary judgment determination that it denied a zoning permit to Plaintiff Keys Youth Services, Inc., based on Keys' familial status in violation of the Fair Housing Act (FHA), 42 U.S.C. § 3604. Keys cross-appeals from the court's bench trial ruling that Olathe's denial of the zoning permit was not based on Keys' handicap status under the FHA and that the permit denial did not violate state law. We have jurisdiction under 28 U.S.C. § 1291.

I.

Keys operates several youth group homes. It purchased a house in an Olathe neighborhood zoned for single-family residential use for the purpose of establishing another group home for ten troubled adolescent males. Unable to qualify as a "family" by Olathe's definition, Keys applied for a special use permit from the city council in order to run the proposed home. In response, the neighbors filed a protest petition with the Olathe Planning Commission. At the subsequent hearings on the matter, they argued that the troubled juveniles would increase area crime and pose a threat to the many children in the area, and that surrounding property values would decrease. At some of these same hearings, Keys supplied the Commission with evidence suggesting the neighbors' fears were unjustified. In the end, the Planning Commission recommended to the

Olathe City Council that Keys be denied a special use permit. By a 4-3 vote, the City Council agreed and Keys subsequently sued.

Keys alleged in its suit that Olathe and four city council members denied it a special use permit for its juvenile group home based on the potential occupants' "familial status" and "handicaps" in violation of the FHA. Keys also alleged that Olathe's permit denial violated Kansas state law. The district court dismissed the claims against the individual council members on qualified immunity grounds. See Keys Youth Servs., Inc. v. City of Olathe, 38 F. Supp.2d 914, 925, 927 (D. Kan. 1999) [hereinafter Keys Youth I]. The court granted complete summary judgment to Keys on its "familial status" claim. See Keys Youth Servs., Inc. v. City of Olathe, 52 F. Supp.2d 1284, 1305-07 (D. Kan. 1999) [hereinafter Keys Youth II], modified by Keys Youth Servs., Inc. v. City of Olathe, 67 F. Supp.2d 1228, 1229, 1231 (D. Kan. 1999). The court also granted Keys summary judgment on its claim that the potential group home residents qualified for handicap status but left for trial the issue of whether Olathe had discriminated on that basis and whether Olathe had violated state law. See Keys Youth II, 52 F. Supp.2d at 1299-1305. Following the bench trial, the district court ruled for Olathe on both issues. See Keys Youth Servs., Inc. v. City of Olathe, 75 F. Supp.2d 1235 (D. Kan. 1999) [hereinafter Keys Youth IV]. Olathe appeals from the court's summary judgment decision on the familial status claim, while Keys

cross-appeals from the court's dismissal of the individual city council members and the court's bench trial decisions on the handicap discrimination and state law claims.

## II.

### A. Familial Status Discrimination

We review de novo the district court's grant of summary judgment and apply the same legal standard employed by that court. See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir.), cert. denied, 120 S. Ct. 53 (1999). To wit, summary judgment should be granted if the evidence submitted shows "that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." Simms, 165 F.3d at 1326. In the instant case, both parties sought summary judgment on the familial status issue.

Since its amendment in 1988, the FHA has prohibited discriminatory housing practices based on familial status. See 42 U.S.C. § 3604(a)-(e). The FHA defines "familial status" as (1) one or more minors (2) "domiciled with" (3) a parent or legal custodian or the designee of a parent or custodian. Id.

§ 3602(k). [1]  Keys' group home satisfies the first element:  there are one or more minors.

Regarding the second element, Olathe intimated to the district court that Keys' living arrangements did not satisfy the "domiciled with" requirement.  Aplt. App. II, at 331, 340-41 (Def. Mem. in Support of Summ. J. Mot., at 14, 23-24).  For unknown reasons, the district court did not address this point, although it did make relevant factual findings (discussed infra).     See Keys Youth II  , 52 F. Supp.2d at 1294  .  Olathe raises the issue again on appeal, and we think it warrants discussion given the somewhat novel application of law to facts presented by Keys' claim. [2]

---

[1]Specifically, § 3602(k) provides:

"Familial status" means one or more individuals (who have not attained the age of 18 years) being domiciled with—

(1) a parent or another person having legal custody of such individual or individuals; or

(2) the designee of such parent or other person having such custody, with the written permission of such parent or other person.

The protections afforded against discrimination on the basis of familial status shall apply to any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of 18 years.

[2]Only two cases of which we are aware have determined whether a group home for youths qualifies for familial status under the FHA:  1) the instant case, Keys Youth II  , 52 F. Supp.2d at 1305-07, and 2)     Children's Alliance v. City of Bellevue , 950 F. Supp. 1491, 1495 n.4 (W.D. Wash. 1997) (refusing to revisit the

There is no material dispute regarding the "living" arrangements at Keys' proposed youth group home. Ten minors would live at the home. They would be supervised twenty-four hours a day by a rotating staff of Keys' employees. Though by no means dispositive, we note that Dr. Edward Neufeld, a licensed psychologist who counsels Keys' existing group home occupants, characterized the Keys' homes as "therapeutic milieus" rather than a "family environment" because, in his view, "these are not group homes that are characterized by a foster parent or two foster parents who are there all the time. It's more a staffing situation." Aplt. App. II at 463.

More specifically, the summary judgment record indicates that in the proposed home in question a "manager" would work from 7:00 a.m. to 3:00 p.m., Monday through Friday; an "assistant manager" and a "staff number 3" employee would work from 2:00 p.m. to 10:00 p.m., Monday through Friday; and an "additional staff member" would work from either 10:00 p.m. to 6:00 a.m. or 11:00 p.m. to 7:00 a.m. each night. Aplt. App. III at 854-55 (Depo. of Keys Program Director). In addition, one "teaching parent" ("shift number 1") would work from 6:00 a.m. Monday morning to 2:00 p.m. Tuesday afternoon, and from 2:00 p.m. Wednesday to 2:00 p.m. Thursday; another "teaching parent" ("shift

court's previous (unpublished) holding that "residents of group homes for youth are encompassed by the FHA's definition of 'familial status'").

number 2") would work from 2:00 p.m. Tuesday to 2:00 p.m. Wednesday, and from 2:00 p.m. Thursday to 10:00 p.m. Friday; a "weekend staff person" would work 10:00 p.m. Friday until 6:00 a.m. Monday morning; and a "part-time staff person" would work 10:00 a.m. to 10:00 p.m. Saturday and Sunday.    Id. at 855. In sum, as the district court put it, "The staff works on day and night shifts and does not reside at the home."    Keys Youth II , 52 F. Supp.2d at 1294.

"Familial status" requires that the minors be domiciled "with" their caretaker. This means that the youths and Keys' staff must be domiciled together, at the same dwelling.    See, e.g. , H.R. Rep. No. 100-711, at 23 (1988),    reprinted in 1988 U.S.C.C.A.N. 2173, 2184 ("The Committee intends to cover by this definition a parent or other person having legal custody, or that individual's designee, domiciled with a child or children under age 18."). The question thus becomes whether any Keys' staff members would be "domiciled" at the proposed home with the youths. [3]

---

[3]Our focus on whether Keys' employees are domiciled with the youths does not mean that a corporate entity like Keys Youth Services is not capable of being the minors' legal custodian. The FHA clearly states that it could.    See 42 U.S.C. § 3602(d) (including corporations as one of the "person[s]" capable of possessing legal custody of juveniles for "familial status" purposes). Rather, our analysis simply presupposes the practical reality that corporations can only act through their agents. Even assuming, however, that the corporate entity Keys Youth Services could somehow be domiciled in the relevant sense at a particular residence independent of its employees/agents, Keys has not argued or proffered evidence suggesting that it is so domiciled.

The FHA does not define "domiciled," nor are we aware of a federal or state court that has done so in the "familial status" context. We therefore look "both to the generally accepted meaning of the term 'domicile' and to the purpose of the statute" for the appropriate definition. Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 47 (1988) (defining "domicile" for purposes of the Indian Child Welfare Act). "Domicile" is a familiar, if not precisely defined, concept in the law. It is typically used for jurisdictional or conflict of laws purposes which "require general recognition of a single State with which the individual, actually or presumptively, is most closely connected." Martinez v. Bynum, 461 U.S. 321, 340 (1982) (Marshall, J., dissenting); see also Restatement (Second) of Conflict of Laws § 11 cmt. f (1971). For purposes of the FHA, however, we must fix the Keys employees' domicile within a specific dwelling, not simply a particular state. Where necessary, we therefore narrow the following principles of domicile accordingly.

A "domicile" is an individual's "'true, fixed, and permanent home and principal establishment.'" Eastman v. Univ. of Mich., 30 F.3d 670, 672-73 (6th Cir. 1994) (quoting Black's Law Dictionary 484 (6th ed. 1990)). Traditionally, an individual has only one domicile at a time. See Williamson v. Osenton, 232 U.S. 619, 625 (1914). An adult establishes a domicile "by physical presence in a place [i.e., a dwelling] in connection with a certain state of mind concerning one's

intent to remain there." Holyfield , 490 U.S. at 48; see also Crowley v. Glaze , 710 F.2d 676, 678 (10th Cir. 1983); Restatement (Second) of Conflict of Laws § 15. There is no question that Keys' staff would be physically present in the group home during their respective shifts. To establish it as their domicile, however, they must also intend to remain—to make that dwelling their home. See Restatement (Second) of Conflict of Laws § 18; see also District of Columbia v. Murphy , 314 U.S. 441, 455 (1941) (stating that the "question of domicile" is "to be settled" by reviewing the " indicia of where a man's home is").

In light of the FHA context of our inquiry, the definition of "home" given in the Restatement (Second) of Conflict of Laws seems particularly applicable: "[T]he place where a person dwells and which is the center of his domestic, social and civil life." Restatement (Second) of Conflict of Laws § 12. While many facts may aid in determining one's home, see id. cmts. c-j; cf. Walbro Corp. v. Amerisure Cos. , 133 F.3d 961, 967 (6th Cir. 1998) (listing potential factors indicating one's domicile), an individual's employment at the site is not one of them. See Restatement (Second) of Conflict of Laws § 12 cmt. f. Absent other indicia, one's workplace is not one's home and, thus, not where one is domiciled for purposes of the FHA.

Based on our review of the summary judgment record in the instant case, it appears the sole connection between Keys' staff and the group home is the fact

that the staff works there. No other reason for their presence in the house is given. Since the staff members clearly do not live at the group home, they must of necessity be residing someplace else, presumably at their actual homes/domiciles. The fact that some of Keys' employees work a night shift or a twenty-four or thirty-six hour shift does not alter our conclusion. The critical fact remains that the only proffered reason these employees occupy the home is for employment. As a matter of law under these circumstances, we cannot conclude that Keys' employees, collectively or individually, are domiciled at the group home. Thus, the youths cannot be "domiciled with" them, and Keys' proposed group home therefore cannot qualify for "familial status" under the FHA. Any other conclusion stretches the meaning of "domiciled" and the scope of "familial status" protection beyond sensible bounds. We reverse the grant of summary judgment for Keys and order summary judgment entered for Olathe on Keys' "familial status" discrimination claim.

## B. Handicap Discrimination

The FHA also forbids discriminatory housing practices based on a potential occupant's handicap(s). See 42 U.S.C. § 3604(f). Prohibited handicap discrimination may take several forms, including (1) disparate treatment, i.e., intentional discrimination; (2) disparate impact, i.e., the discriminatory effect of a facially neutral practice or policy; (3) a refusal to permit "reasonable

modifications of existing premises"; (4) a "refusal to make reasonable accommodations in rules, policies, practices, or services"; or (5) a failure to "design and construct" handicap accessible buildings. 42 U.S.C. § 3604(f)(3) (outlining reasonable modification and accommodation claims and failure to design and construct claim); see also Bangerter v. Orem City Corp., 46 F.3d 1491, 1500-01 (10th Cir. 1995) (discussing disparate treatment and impact claims).

In the instant case, Keys has made out two discrimination claims. First, Keys alleges that Olathe intentionally denied the permit because of the juveniles' handicaps. [4] Olathe countered that it denied the permit because the troubled juveniles would pose a legitimate threat to neighborhood safety, not because they were handicapped. Because Keys presented no direct evidence of intentional discrimination, [5] see Keys Youth IV, 75 F. Supp.2d at 1243-44, and Olathe offered

---

[4]Of course, to prevail on a handicap discrimination claim, Keys' residents must in fact be handicapped. On this threshold issue the district court granted summary judgment to Keys because it concluded that at least some of the proposed occupants satisfied the FHA's definition of handicap. See Keys Youth II, 52 F. Supp.2d at 1299. That decision was not appealed. Although, in response to Keys' cross-appeal, Olathe does argue that the district court erred in ruling that some Keys' residents qualify for handicap status under the FHA. However, we need not reach, and express no opinion on, that issue. We assume for the sake of argument that Keys qualifies for handicap protection.

[5]Keys did not designate this finding as an issue for review in either the notice of appeal or the formal statement of the issues in its brief, although Keys' brief does contain a few scattered statements that the Olathe ordinance defining "family" directly discriminates against the handicapped. The district court specifically rejected this argument in its summary judgment decision. See Keys Youth II, 52 F. Supp.2d at 1300. Moreover, Keys' intermittent suggestions of

a legitimate nondiscriminatory basis for its decision, the sole issue for trial focused on whether Olathe's safety concerns were mere pretext for handicap discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). [6] "[W]eighing all of the evidence," the district court determined that "the City Council denied the permit because it reasonably determined that the residents of the [group] home would pose a safety threat to residents of the neighborhood." Keys Youth IV, 75 F. Supp.2d at 1245. In short, the court found that Olathe's justification was not "mere pretext" for handicap discrimination. Id. Keys cross-appeals from this ruling.

---

facial discrimination do not even mention the district court's pointed adverse ruling. "[S]uch perfunctory complaints fail to frame and develop an issue sufficient to invoke appellate review." Murrell v. Shalala, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994).

[6]Had Keys proffered direct evidence of intentional discrimination, the McDonnell Douglas burden shifting/pretext analysis would be inapposite. See Bangerter, 46 F.3d at 1500 n.16. Instead, the court would have had to determine whether Olathe's discriminatory actions were nevertheless protected under relevant provisions of the FHA or Title VII. See id. at 1503. For example, the FHA expressly permits handicap discrimination if predicated on public safety or property damage concerns. See 42 U.S.C. § 3604(f)(9). This statutory affirmative defense, of sorts, states: "Nothing in this subsection [regarding handicap discrimination] requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others." However, Bangerter and § 3604(f)(9) do not control the instant case because, absent direct evidence of disparate treatment, the question at trial and before this court is whether Olathe discriminated at all, not whether its discrimination is nevertheless justified.

-12-

In an appeal from a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo. See Sanpete Water Conservancy Dist. v. Carbon Water Conservancy Dist., 226 F.3d 1170, 1177-78 (10th Cir. 2000). Whether Olathe's public safety concerns were mere pretext for handicap discrimination is a factual issue. See Mohammed v. Callaway, 698 F.2d 395, 399 (10th Cir. 1983). Thus, we will reverse the district court's finding only "if it is without factual support in the record" or if, "after reviewing all the evidence," we are "left with a definite and firm conviction that a mistake has been made." Manning v. United States, 146 F.3d 808, 812 (10th Cir. 1998) (internal quotation marks omitted).

The court reached its decision after weighing the following evidence.[7] Keys operates group homes for youths between the ages of twelve and seventeen who have been abused, neglected, or abandoned. The Kansas Department of Social and Rehabilitation Services, which places most of Keys' youth, categorizes juvenile behavioral problems from level III to level VI. Keys applied for a permit

_____

[7]The district court outlined in detail the evidence known to Olathe at the time it decided to deny the special use permit. See Keys Youth IV, 75 F. Supp.2d at 1237-43. Keys has not challenged the court's factual findings, nor suggested additional evidence that the court failed to consider. More importantly, our review of the record has not revealed material unconsidered facts or undermined our confidence in the district court's statement of facts. Because the district court has already published a detailed account of the undisputed facts relevant to Olathe's decision, we only summarize the most pertinent evidence here.

in order to open a level V home for ten males in a single-family residential neighborhood. Level V teenagers are typically antisocial and aggressive, engaging in assaults, batteries, thefts, and vandalism. Parents and teachers describe level V youths as cruel, aggressive, moody, argumentative, uncooperative, disruptive, and occasionally assaultive. At the time of the permit application, Keys was already managing a level V home elsewhere in Olathe. Unlike that existing home, however, the proposed home in question would sit in close proximity to numerous residences and within walking distance of several schools and day care centers. At public hearings regarding the proposed home, neighbors voiced their concerns about the safety of area children. They also reported that Keys' youths had once escaped the existing group home in Olathe and had gone on a crime spree that included setting a car on fire, burglarizing cars, defecating on a car, shoplifting, and vandalizing. Moreover, neighbors furnished Olathe with information about the numerous phone calls made to police from other Keys' homes reporting various criminal conduct and provided anecdotal accounts of their own negative experiences with, or perceptions of, level V juveniles.

In its own presentations to Olathe, Keys attempted to downplay much of the neighbors' evidence. For instance, Keys showed that after the crime-spree incident it had hired additional nighttime staff at level V homes, which thus far

had prevented similar break-outs. In addition, Keys explained that a vast majority of the police calls originating from Keys' homes involved in-house incidents only; no neighbors were affected. Dr. Neufeld also opined that Keys' residents posed less of a public threat than their less supervised peers. In the end, however, the Olathe City Council voted 4-3 to deny Keys' request for a special use permit, despite legal advice urging that the request be granted. All four council members who voted to deny the permit testified that they did so due to public safety concerns.

On appeal, Keys essentially argues that its evidence conclusively establishes that a level V home does not create a public danger. To be sure, Keys' evidence might lead a reasonable person to that conclusion. However, Olathe's fears are not groundless. Level V youths are undisputedly dangerous and have caused problems of real concern in the past. It is not unreasonable to think that they are capable of causing similar problems in the future. In short, the district court, acting as the factfinder, reasonably could have chosen either of two plausible interpretations of the facts. Under the clearly erroneous standard of review, we must therefore affirm the court's choice. As the Supreme Court has stated:

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two

permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985). We turn now to Keys' second handicap discrimination claim.

As noted supra, handicap discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). For zoning purposes, Olathe's ordinances define "family," in relevant part, as "a group of eight (8) or fewer unrelated disabled persons including two (2) additional persons acting as houseparents or guardians who need not be related to each other or to any of the disabled persons in residence." Aplt. App. VI at 1660 (Olathe Unified Dev. Code § 18.06.240). Keys claims that when Olathe denied it a special use permit to house ten youths plus staff in a single-family neighborhood, the City refused to reasonably accommodate its ordinances to Keys' needs. [8]

---

[8] We acknowledge some confusion regarding the exact ordinance(s) or statute(s) that Keys requested be changed to accommodate its special use permit. In the summary judgment decision, the district court suggested that Keys sought accommodation from a state statute governing group homes and the Olathe ordinance defining family. See Keys Youth II, 52 F. Supp.2d at 1304. At trial, however, the district court suggested that Keys sought accommodation from the Kansas group home statute and the Olathe ordinance defining "group board home for minors." See Keys Youth IV, 75 F. Supp.2d at 1245. Finally, Keys appears to argue in its brief that its claim is based purely on the Olathe ordinance defining family. See Appellee/Cross-Aplt. Br. at 9. We follow this latest articulation of

-16-

The crux of Keys' argument is that it must house no less than ten youths in order to generate enough funds to survive. Following the bench trial, the court stated that the ten-resident minimum may be "necessary," but nevertheless ruled for Olathe because Keys had failed to demonstrate its economic need for the accommodation to the City. See Keys Youth IV , 75 F. Supp.2d at 1246-47. The court based its decision on the principle that Olathe cannot be liable for refusing to grant a reasonable and necessary accommodation if the City never knew the accommodation was in fact necessary. We agree. See Oxford House-A v. City of Univ. City , 87 F.3d 1022, 1025 (8th Cir. 1996) ("Congress . . . did not intend the federal courts to act as zoning boards by deciding fact-intensive accommodation issues in the first instance." (internal quotation marks omitted)); see also Bryant Woods Inn, Inc. v. Howard County, Md. , 124 F.3d 597, 604-05 (4th Cir. 1997) (discussing reasonableness and necessity of a requested accommodation in light of evidence presented to the local zoning board). Hence, the issue on appeal is whether Olathe realized Keys' need to house ten youths instead of eight. Keys does not point to any evidence suggesting that its economic need argument was presented to the Planning Commission or the City Council. In fact, Keys'

---

the claim. At any rate, our analysis would remain the same whatever the precise regulation Keys desired to modify.

executive director testified at trial that she did not believe "the economics of the situation came up at the Planning Commission." Aplt. App. V, at 1245.

In addition, we can affirm the court's reasonable accommodation ruling for a separate reason. Even assuming that Keys presented its economic necessity argument to the City Council, we conclude that the requested accommodation—housing ten troubled adolescents instead of eight—is not "reasonable" in light of Olathe's legitimate public safety concerns. Common sense dictates that when a defendant possesses a legitimate nondiscriminatory reason for a housing decision, a plaintiff's requested accommodation must substantially negate the defendant's concern in order to be considered reasonable. See, e.g. , Bryant Woods Inn , 124 F.3d at 604 (requested accommodation deemed unreasonable because it would only exacerbate existing problem). For example, if the evidence in the instant case showed that housing ten juveniles instead of eight actually resolved the safety problem, then Keys' request would be reasonable. However, we see nothing in the record so indicating. We therefore affirm the district court's reasonable accommodation ruling.

## C. State Law Claim

Finally, Keys appeals the district court's rejection of its state law claim. Keys had asserted that Olathe's denial of the permit violated chapter 12, article 736 of the Kansas Statutes Annotated. This provision explains that it is the policy

of Kansas that "persons with a disability shall not be excluded from the benefits of single family residential surroundings by any municipal zoning ordinance, resolution or regulation." Kan. Stat. Ann. § 12-736(a). The statute further mandates that "[n]o municipality shall prohibit the location of a group home in any zone or area where single family dwellings are permitted." Id. § 12-736(e). However, the statute defines "group home" as "any dwelling occupied by not more than 10 persons, including eight or fewer persons with a disability who need not be related by blood or marriage and not to exceed two staff residents who need not be related by blood or marriage to each other or to the residents of the home, which dwelling is licensed by a regulatory agency of this state." Id. § 12-736(b)(1).

In considering Olathe's summary judgment motion on this claim, the court noted its uncertainty concerning article 12-736's meaning and its asserted applicability to Keys' juvenile group home. See Keys Youth II, 52 F. Supp.2d at 1309. "Under one reading of the statute," the court stated, "Keys may be absolutely entitled to ten residents plus two staff [e.g., eight disabled residents, two non-disabled residents, and two non-residential staff]." Id. "Under another reading of the statute," the court continued, "Keys would not fare so well." Id. The court thus refused to grant summary judgment on this legally and factually undeveloped claim. See id. Despite the court's unambiguous request for

explication, Keys made little effort to explain the statute's meaning or its application to the youth home during the bench trial. Instead, it appears Keys simply argued to the court that article "12-736 requires the City to allow Keys to operate a group home housing eight handicapped persons." Keys Youth IV, 75 F. Supp.2d at 1248. The court noted, however, that "Keys has not clarified how [Olathe's] refusal to allow ten residents would violate K.S.A. § 12-736" given the particular facts of this case. See id. The court therefore entered judgment in Olathe's favor.

We agree that article 12-736 may not be the clearest statute in some respects. Nonetheless, it plainly limits group homes to "any dwelling occupied by not more than 10 persons." Kan. Stat. Ann. § 12-736(b)(1). In the instant case, the proposed home, by Keys' own admission, would be occupied by more than ten persons—ten juveniles plus staff. Thus, it would not qualify as a group home under article 12-736, and Keys has no basis upon which to assert an article 12-736 violation. We affirm the district court's rejection of Key's state law claim.

IV.

In sum, we REVERSE the district court's summary judgment decision on Keys' "familial status" claim and order summary judgment entered for Olathe. We AFFIRM the court's bench trial decisions on Keys' intentional discrimination,

-20-

reasonable accommodation, and state law claims. The qualified immunity issues are now MOOT.