FILED
United States Court of Appeals
Tenth Circuit

June 4, 2008

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

DARR ANGELL, individually, and
STATE OF NEW MEXICO ex rel.
DARR ANGELL,

      Plaintiffs-Appellants,

v.

POLARIS PRODUCTION
CORPORATION,

      Defendant-Appellee.

No. 07-2034

(D.C. No. CIV-03-318 JCH/RLP)
(D. New Mexico)

---

**ORDER AND JUDGMENT**[*]

---

Before **HENRY,** Chief Judge, **BRISCOE,** and **HOLMES**, Circuit Judges.

---

In this diversity action, Plaintiff Darr Angell appeals the district court's ruling in favor of Defendant Polaris Production Corporation (Polaris) after a two-day bench trial. Mr. Angell brought suit on behalf of the State of New Mexico alleging that Polaris created a public nuisance by contaminating the groundwater beneath his property.[1] We

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] Mr. Angell brought his suit pursuant to the citizen-suit provision of the public nuisance statute, which provides:

(continued...)

exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

Mr. Angell is a cattle rancher in southeastern New Mexico and owns 1,000 acres of land in a part of the Permian Basin known as the Denton Oil Field. He acquired part of this land in 1992, and the rest in 1993. The ranch includes several gas and oil leases, and among the leases he acquired in 1992 was the Priest lease. Shell Oil Co. (Shell) operated the Priest lease from 1947 until 1973, when it sold its interest to Polaris. Polaris then operated the lease until 2000, and then sold its interest to United Operating LLC (United), which operated the lease until 2003. Since 2003 several different exploration companies have operated the lease. Mr. Angell claims that when he acquired the Priest lease in 1992, the property was "in really bad shape" as a result of oil spills and soil contamination. ROA, Vol. I, at 150. In August 2001, Mr. Angell drilled a test well near the Priest lease tank battery, and observed contamination in five to seven feet of the soil and on the top of the water table.

Mr. Angell sued Shell, Polaris, and United in New Mexico state court seeking damages and injunctive relief on theories of negligence, gross negligence, trespass, and

[1](...continued)
A civil action to abate a public nuisance may be brought, by verified complaint in the name of the state without cost, by any public officer or private citizen, in the district court of the county where the public nuisance exists, against any person, corporation or association of persons who shall create, perform or maintain a public nuisance.

N.M. Stat. § 30-8-8(B).

2

unjust enrichment. He also filed a public nuisance claim on behalf of the State of New Mexico. In February 2003, United filed for bankruptcy in Texas, which led Shell to remove this case from state court in New Mexico to federal court, and seek a venue transfer to the bankruptcy court in Texas. Both Mr. Angell and Polaris opposed the motion to transfer venue and the district court ultimately denied that request. Mr. Angell later reached a settlement agreement with United. Following discovery, the district court granted Polaris's and Shell's separate motions for summary judgment on Mr. Angell's individual claims, but denied summary judgment on the public nuisance claim.

The case proceeded to a two-day bench trial on the public nuisance claim. Evidence presented at trial indicated that the Priest lease groundwater was contaminated due to oil spills. This conclusion was based principally on the analysis of samples taken from two monitor wells. Mr. Angell also presented evidence that while Polaris operated the Priest lease, it installed a Kobe Triplex oil pump that leaked during much of its usage, creating a pool of standing oil and processed water near the tank battery. Union removed the Kobe Triplex pump upon its takeover of the Priest lease. Throughout the time Polaris owned the property, the New Mexico Oil Conservation Division (NMOCD) noted that there was free oil standing around the tank battery, and it considered this a threat to the groundwater. However, only one Polaris oil spill exceeded five barrels, which was the point at which a state reporting requirement was triggered. There was also testimony that oil spills were common in this industry.

The NMOCD also noted that as of 1997 there was no evidence of groundwater

3

pollution. Evidence of groundwater contamination did not appear until August 2001 when the first monitor well was drilled, which was ten months after United took control of the Priest lease. United had also experienced leaks during its operation of the property. Additionally, other oil companies operating in close proximity to the Priest lease experienced major oil spills. There was also evidence presented that Shell had spilled oil on the Priest lease prior to Polaris's takeover of the land and that it was customary in the earlier days of oil production for operators to spread oil on the ground to settle dust. Mr. Angell did note at trial that "If Shell had a release at some point, I'm not sure that that's not the oil that migrated down to the water table." ROA, Vol. I, at 178. After the first day of testimony, Mr. Angell voluntarily dismissed the claim against Shell after the former president of Polaris testified that Polaris installed the Kobe Triplex pump and that the Priest lease was in "real good shape" when Polaris took over from Shell. Id. at 334.

After hearing the trial evidence and receiving suggested findings and conclusions from the parties, the district court entered its findings of fact and conclusions of law. The district court ruled against Mr. Angell on his public nuisance claim, concluding specifically that Mr. Angell "did not meet his burden of proof that Polaris created a public nuisance" and "did not meet his burden of proof that Polaris caused the contamination . . . ." ROA, Vol. II, at 647.

II.

Mr. Angell argues that the district court erred in ruling in favor of Polaris on his public nuisance claim. Specifically, he contends that the district court's factual findings

4

reveal that the court applied an erroneous legal standard to the causation element of the New Mexico public nuisance statute by requiring him to present specific evidence he had no burden to introduce.

When considering "an appeal from a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo." Keys Youth Servs. v. City of Olathe, 248 F.3d 1267, 1274 (10th Cir. 2001). But a "reviewing court is not bound by the clearly erroneous standard when the trial court has based its findings on an erroneous view of the law" and if "the district court viewed the evidence under an incorrect legal standard . . . our task must be to determine whether the error was harmless." Valley Improvement Assoc., Inc. v. U.S. Fid. & Guar. Corp., 129 F.3d 1108, 1123 (10th Cir. 1997). Mr. Angell relies on Valley Improvement to argue that the district court's ruling should be reversed because the court based its ruling upon a misapprehension of the law. He contends that if the district court's ruling that Mr. Angell failed to prove Polaris caused the groundwater contamination results from erroneous evidentiary requirements, then its conclusion regarding causation is clearly erroneous and we may only affirm based on a showing of harmless error. See id.

New Mexico defines a public nuisance as "knowingly creating, performing or maintaining anything affecting any number of citizens without lawful authority which is either (A) injurious to public health, safety, morals or welfare; or (B) interferes with the exercise and enjoyment of public rights, including the right to use public property." N.M. Stat. § 30-8-1. The New Mexico public nuisance statute also provides that "[p]olluting

5

water consists of knowingly and unlawfully introducing any object or substance into any body of public water causing it to be offensive or dangerous for human or animal consumption or use," and makes polluting water a per se public nuisance. N.M. Stat. § 30-8-2.

Mr. Angell claims that the district court required him to introduce evidence of causation beyond that required by the statute. As evidence of this alleged heightened burden of proof, he points to four of the district court's factual findings that identify the absence of certain specific evidence. In its factual findings, the court noted that Mr. Angell (1) "does not use, nor has he ever used, Monitor Well Number 1 for his cattle;" (2) "did not provide any expert testimony that established Polaris caused the contamination to the liquid that was pumped from any monitor well either in 2001 or 2006;" (3) "did not provide any expert testimony that established the effects of the substances found in the liquid that was pumped from any monitor well;" and (4) "did not provide sufficient evidence to determine the age, volume, or source of any groundwater contamination that may have been discovered in any monitor wells drilled at the Priest Lease." ROA, Vol. II, at 643, 647. While Mr. Angell does not dispute the accuracy of any of these findings, he argues that these "negative findings" represent an implicit holding that he had to present this evidence in order to establish causation.

We need not reach the legal questions of whether New Mexico's public nuisance statute requires, as a matter of law, expert testimony as to the specific origin of the contamination, expert testimony as to the specific effects of the groundwater

6

contaminants, evidence as to the "age, volume, or source" of the contaminants, or evidence of use of the contaminated water for a commercial purpose. Instead, we reject Mr. Angell's argument that because the district court noted these evidentiary shortcomings, it must have required him to offer this evidence to succeed. The district court's legal conclusions do not bear this out. To show the imposition of an erroneous burden, a party must provide more evidence of a heightened legal burden than the presence of "negative findings."

Our opinion in Valley Improvement is consistent with this view of the district court's decision. In Valley Improvement, we reversed a district court's finding that an insurance company's denial of coverage was unreasonable because the court's sole rationale for that holding was its erroneous legal conclusion that an insurance company must investigate the facts underlying a claim before it can reasonably deny coverage. We determined that this erroneous legal conclusion "was a critical part of the judge's analysis, if not the sole basis for his ruling." 129 F.3d at 1121. Mr. Angell's attempt to analogize his case to Valley Improvement fails because he has not demonstrated that the district court's dismissal of his public nuisance claim rested on an erroneous legal conclusion. There is simply no basis for concluding that the district court's decision rested solely on the absence of expert testimony, the failure to prove the specific harmful effects of the substances, or the fact that Mr. Angell did not use water from the monitoring wells for his cattle. Further, as regards the district court's alleged requirement that Mr. Angell present expert testimony in order to establish causation under the public

7

nuisance statute, the district court's pre-trial rulings suggest that the district court rejected such a notion.  Polaris argued in its pre-trial briefing that Mr. Angell could not prove causation as a matter of law without expert testimony, but the district court expressly rejected this argument as a possible rationale for summary judgment.

The district court's decision is replete with factual findings suggesting that Polaris and the Kobe Triplex pump were not the cause of the contamination.  The court noted that all groundwater testing occurred after Polaris ceased operations on the Priest lease.  A representative of the state agency that monitors environmental compliance testified under oath that as of 1997 there was no evidence of groundwater pollution.  The evidence also identifies several other possible sources of the contamination.  Responsibility for the groundwater contamination could lie with one of the other operators working near the Priest lease who caused one of the major oil spills in the area.  Shell could also be responsible based on its practices while operating the Priest lease prior to Polaris's takeover.  United could also have caused the contamination after Polaris ceased operations on the Priest lease.  This case differs from Valley Improvement if for no other reason than the breadth of evidence supporting the district court's conclusion that Mr. Angell had not established that Polaris caused the contamination.

Mr. Angell's evidence suggests that the Kobe Triplex oil pump installed and used by Polaris may well have caused the groundwater contamination.  But the oil spills by Shell and United, as well as the major oil spills by other exploration companies operating near the Priest lease, also suggest that the groundwater contamination could have come

8

from another source. Thus, while a conclusion that Polaris contributed to or caused the contamination would not have lacked support, in order to reverse the district court we would have to conclude that the district court's contrary conclusion is not supported by the record. Given the number of entities who operated the Priest lease and the evidence of past practices, the district court's ruling in favor of Polaris is sufficiently supported.

The judgment of the district court is AFFIRMED.

Entered for the Court,


Mary Beck Briscoe
Circuit Judge